Michael A. Bliven
BLIVEN LAW FIRM, PC
704 S. Main
Kalispell, MT 59901
Telephone: (406) 755-6828
mike@blivenlawfirm.com

John Heenan
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
john@lawmontana.com

Steve W. Berman (*pro hac vice* to be applied for)
Craig R. Spiegel (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
craigs@hbsslaw.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MONTANA**

**BUTTE DIVISION**

CITY AND COUNTY OF BUTTE-SILVER BOW,

Plaintiff,

v.

3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY); DUPONT DE NEMOURS, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; GLOBE MANUFACTURING COMPANY, LLC; W.L. GORE & ASSOCIATES, INC.; and LION GROUP, INC.,

Defendants.

Case No. ____________________

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | PARTIES | 8 |
| | A. Plaintiff | 8 |
| | B. Defendants | 10 |
| III. | JURISDICTION AND VENUE | 13 |
| IV. | SUBSTANTIVE ALLEGATIONS | 14 |
| | A. General Allegations Regarding Per- and Polyfluoroalkyl Substances | 14 |
| | B. General Allegations Regarding PFAS-Containing Turnout Gear | 20 |
| | C. Defendants' Contributions to PFAS-Containing Turnout Gear | 25 |
| | D. Defendants' Knowledge of the Dangers of PFAS | 28 |
| | 1. Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS | 28 |
| | 2. Defendant DuPont's Long-Standing Knowledge of the Dangers of PFAS | 32 |
| | 3. The Remaining Defendants' Knowledge of the Dangers of PFAS | 37 |
| | E. Defendants' Failure to Provide Safety Warnings on Product Labels | 44 |
| | F. Defendants' Ability to Design Safer Turnout Gear | 46 |

V. CLASS ALLEGATIONS 48

VI. TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF LIMITATIONS DISCOVERY RULE TOLLING 51

VII. FRAUDULENT CONCEALMENT TOLLING 53

VIII. CLAIMS ON BEHALF OF PLAINTIFF AND ALL CLASS MEMBERS 53

COUNT I (against all Defendants) Violations of Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1962(c), (d) 53

1. The members of the PFAS Concealment Enterprise. 54

2. The Predicate Acts 64

B. State Law Claims 71

1. Claim brought on behalf of all Class members relating to their State-law claims for a single state law class in each state. 71

COUNT II Conspiracy 71

A. State Law Claims 71

1. Claim brought on behalf of all Class members relating to their State-law claims for a single state law class in each state. 71

COUNT III Conspiracy 71

2. Claims brought by the Montana class for purchase of turnout gear in Montana. 72

COUNT IV Strict Liability (design defect) 72

COUNT V Strict Products Liability (Failure to Warn) 74

COUNT VI Implied Warranty of Merchantability Mont. Code Ann. §

30-2-314 For Plaintiff and the Montana Class 76

COUNT VII VIOLATIONS OF MONTANA CONSUMER PROTECTION ACT Mont. Code Ann §§ 30-14-101 et seq. Brought on Behalf of the Montana Class 77

3. Claims brought on behalf of Class members who installed their turnout gear in Alabama (the “Alabama Class members”). 79

COUNT VIII (against all Defendants) Alabama Extended Manufacturer’s Liability Doctrine (design defect) 79

COUNT IX (against all Defendants) Alabama Extended Manufacturer’s Liability Doctrine (failure to warn) 82

4. Claims brought on behalf of Class members who installed their turnout gear in Alaska (the “Alaska Class members”). 84

COUNT X (against all Defendants) Strict Products Liability (design defect) 84

COUNT XI (against all Defendants) Strict Products Liability (failure to warn) 86

COUNT XII (against all Defendants) Violation of the Alaska Unfair Trade Practices and Consumer Protection Act (Alaska Stat. Ann. § 45.50.471 et seq.) 88

5. Claims brought on behalf of Class members who installed their turnout gear in Arizona (the “Arizona Class members”). 91

COUNT XIII (against all Defendants) Strict Products Liability (design defect) 91

COUNT XIV (against all Defendants) Strict Products Liability (failure to warn) 93

COUNT XV (against all Defendants) Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. § 44-1521 et seq.) 95

6. Claims brought on behalf of Class members who installed their turnout gear in Arkansas ("Arkansas Class members"). 98

COUNT XVI (against all Defendants) Strict Products Liability (design defect) 98

COUNT XVII (against all Defendants) Strict Products Liability (failure to warn) 100

7. Claims brought on behalf of Class members who installed their turnout gear in California ("California Class members"). 102

COUNT XVIII (against all Defendants) Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.) 102

8. Claims brought on behalf of Class members who installed their turnout gear in Colorado ("Colorado Class members"). 104

COUNT XIX (against all Defendants) Strict Products Liability (design defect) 104

COUNT XX (against all Defendants) Strict Products Liability (failure to warn) 106

COUNT XXI (against all Defendants) Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101 et seq.) 108

9. Claims brought on behalf of Class members who installed their turnout gear in Connecticut (collectively, "Connecticut Class members"). 110

COUNT XXII (against all Defendants) Strict Products Liability (design defect) 110

COUNT XXIII (against all Defendants) Strict Products Liability (failure to warn) 113

10. Claims brought on behalf of Class members who installed their turnout gear in Delaware ("Delaware Class members"). 114

COUNT XXIV (against all Defendants) Negligence (design defect) 114

COUNT XXV (against all Defendants) Negligence (failure to warn) 117

COUNT XXVI (against all Defendants) Violation of the Delaware Consumer Fraud Act (Del. Code Tit. 6, § 2513 et seq.) 118

11. Claims brought on behalf of Class members who installed their turnout gear in Georgia ("Georgia Class members"). 121

COUNT XXVII (against all Defendants) Violation of the Georgia Fair Business Practices Act (Ga. Code Ann. § 10-1-390 et seq.) 121

COUNT XXVIII (against all Defendants) Violation of the Georgia Uniform Deceptive Trade Practices Act (Ga. Code Ann. § 10-1-370 et seq.) 124

12. Claims brought on behalf of Class members who installed their turnout gear in Hawaii ("Hawaii Class members"). 124

COUNT XXIX (against all Defendants) Strict Products Liability (design defect) 124

COUNT XXX (against all Defendants) Strict Products Liability (failure to warn) 127

13. Claims brought on behalf of Class members who installed their turnout gear in Illinois ("Illinois Class members"). 128

COUNT XXXI (against all Defendants) Strict Products Liability (design defect) 128

COUNT XXXII (against all Defendants) Strict Products Liability (failure to warn) 131

COUNT XXXIII (against all Defendants) Violation of Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. 505/1 et seq.) 132

14. Claims brought on behalf of Class members who installed their turnout gear in Indiana ("Indiana Class members"). 135

COUNT XXXIV (against all Defendants) Violation of Indiana Products Liability Act Ind. Code Ann. § 34-20-1-1 et seq. (design defect) 135

COUNT XXXV (against all Defendants) Violation of Indiana Products Liability Act Ind. Code Ann. § 34-20-1-1 et seq. (failure to warn) 138

15. Claims brought on behalf of Class members who installed their turnout gear in Iowa ("Iowa Class members"). 139

COUNT XXXVI (against all Defendants) Design Defect claim 139

COUNT XXXVII (against all Defendants) Failure to Warn Claim 142

COUNT XXXVIII (against all Defendants) Violation of Iowa Private Right of Action for Consumer Frauds Act (Iowa Code § 714h.1 et seq.) 143

16. Claims brought on behalf of Class members who installed their turnout gear in Maryland ("Maryland Class members"). 146

COUNT XXXIX (against all Defendants) Strict Products Liability (design defect) 146

COUNT XL (against all Defendants) Strict Products Liability (failure to warn) 148

COUNT XLI (against all Defendants) Violation of Maryland Consumer Protection Act (Md. Code Ann., Com. Law § 13-101 et seq.) 150

17. Claims brought on behalf of Class members who installed their turnout gear in Massachusetts ("Massachusetts Class members"). 152

COUNT XLII (against all Defendants) Breach of the implied warranty of merchantability (design defect) 152

COUNT XLIII (against all Defendants) Breach of the Implied Warranty of Merchantability (failure to warn) 154

COUNT XLIV (against all Defendants) Violation of the Massachusetts General Law Chapter 93A (Mass. Gen. Laws Ch. 93A, § 1 et seq.) 156

18. Claims brought on behalf of Class members who installed their turnout gear in Minnesota ("Minnesota Class Members") 158

COUNT XLV (against all Defendants) Strict Products Liability (design defect) 158

COUNT XLVI (against all Defendants) Strict Products Liability (failure to warn) 160

19. Claims brought on behalf of Class members who installed their turnout gear in Missouri ("Missouri Class members"). 162

COUNT XLVII (against all Defendants) Strict Products Liability (design defect) 162

COUNT XLVIII (against all Defendants) Strict Products Liability (failure to warn) 165

COUNT XLIX (against all Defendants) Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. § 407.005 et seq.) 166

20. Claims brought on behalf of Class members who installed their turnout gear in Nevada ("Nevada Class members"). 169

COUNT L (against all Defendants) Strict Products Liability (design defect) 169

COUNT LI (against all Defendants) Strict Products Liability (failure to warn) 171

COUNT LII (against all Defendants) Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. § 598.0903 et seq.) 173

21. Claims brought on behalf of Class members who installed their turnout gear in New Hampshire ("New Hampshire Class members"). 175

COUNT LIII (against all Defendants) Strict Products Liability (design defect) 175

COUNT LIV (against all Defendants) Strict Products Liability (failure to warn) 177

COUNT LV (against all Defendants) Violation of the New Hampshire Consumer Protection Act (N.H. Rev. Stat. Ann. § 358-A:1 et seq.) 179

22. Claims brought on behalf of Class members who installed their turnout gear in New Jersey ("New Jersey Class members"). 181

COUNT LVI (against all Defendants) Strict Products Liability (design defect) 181

COUNT LVII (against all Defendants) Strict Products Liability (failure to warn) 184

COUNT LVIII (against all Defendants) Violation of the New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1 et seq.) 185

23. Claims brought on behalf of Class members who installed their turnout gear in New Mexico ("New Mexico Class members"). 188

COUNT LIX (against all Defendants) Strict Products Liability (design defect) 188

COUNT LX (against all Defendants) Strict Products Liability (failure to warn) 190

COUNT LXI (against all Defendants) Violation of the New Mexico Unfair Trade Practices Act (N.M. Stat. Ann. § 57-12-1 et seq.) 191

24. Claims brought on behalf of Class members who installed their turnout gear in New York ("New York Class members"). 194

COUNT LXII New York Consumer Protection Claim 194

25. Claims brought on behalf of Class members who installed their turnout gear in North Carolina ("North Carolina Class members"). 195

COUNT LXIII (against all Defendants) Products Liability (design defect) 195

COUNT LXIV (against all Defendants) Products Liability (failure to warn) 197

COUNT LXV (against all Defendants) Violation of North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1 et seq.) 199

26. Claims brought on behalf of Class members who installed their turnout gear in Oklahoma (collectively, "Oklahoma Class members"). 201

COUNT LXVI (against all Defendants) Strict Products Liability (design defect) 201

COUNT LXVII (against all Defendants) Strict Products Liability (failure to warn) 204

COUNT LXVIII (against all Defendants) Violation of the Oklahoma Consumer Protection Act (Okla. Stat. Tit. 15, § 751 et seq.) 205

27. Claims brought on behalf of Class members who installed their turnout gear in Oregon (collectively, "Oregon Class members"). 208

COUNT LXIX (against all Defendants) Strict Products Liability (design defect) 208

COUNT LXX (against all Defendants) Strict Products Liability (failure to warn) 210

COUNT LXXI (against all Defendants) Violation of the Oregon Unlawful Trade Practices Act (Or. Rev. Stat. § 646.605 et seq.) 212

28. Claims brought on behalf of Class members who installed their turnout gear in Pennsylvania ("Pennsylvania Class members"). 214

COUNT LXXII (against all Defendants) Strict Products Liability (design defect) 214

COUNT LXXIII (against all Defendants) Strict Products Liability (failure to warn) 217

COUNT LXXIV (against all Defendants) Violation of the Pennsylvania Unfair Trade Practices And Consumer Protection Law (73 Pa. Cons. Stat. § 201-1 et seq.) 218

29. Claims brought on behalf of Class members who installed their turnout gear in South Carolina (collectively, "South Carolina Class members"). 219

COUNT LXXV (against all Defendants) Strict Products Liability (design defect) 219

COUNT LXXVI (against all Defendants) Strict Products Liability (failure to warn) 222

COUNT LXXVII (against all Defendants) Violation of the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 et seq.) 223

30. Claims brought on behalf of Class members who installed their turnout gear in South Dakota ("South Dakota Class members"). 224

COUNT LXXVIII (against all Defendants) Strict Products Liability (design defect) 224

COUNT LXXIX (against all Defendants) Strict Products Liability (failure to warn) 227

COUNT LXXX (against all Defendants) Violation of the South Dakota Deceptive Trade Practices And Consumer Protection Law (S.D. Codified Laws § 37-24-6 et seq.) 229

31. Claims brought on behalf of Class members who installed their turnout gear in Tennessee ("Tennessee Class members"). 231

COUNT LXXXI (against all Defendants) Strict Products Liability (design defect) 231

COUNT LXXXII (against all Defendants) Strict Products Liability (failure to warn) 233

32. Claims brought on behalf of Class members who installed their turnout gear in Texas ("Texas Class members"). 235

COUNT LXXXIII (against all Defendants) Strict Products Liability (design defect) 235

COUNT LXXXIV (against all Defendants) Strict Products Liability (failure to warn) 237

COUNT LXXXV (against all Defendants) Violation of the Texas Deceptive Trade Practices and Consumer Protection Act (Tex. Bus. & Com. Code § 17.4 et seq.) 239

33. Claims brought on behalf of Class members who installed their turnout gear in Utah ("Utah Class members"). 242

COUNT LXXXVI (against all Defendants) Strict Products Liability (design defect) 242

COUNT LXXXVII (against all Defendants) Strict Products Liability (failure to warn) 245

34. Claims brought on behalf of Class members who installed their turnout gear in Washington ("Washington Class members"). 246

COUNT LXXXVIII (against all Defendants) Violation of Washington Consumer Protection Act (Wash. Rev. Code Ann. § 19.86.010 et seq.) 246

35. Claims brought on behalf of Class members who installed their turnout gear in West Virginia ("West Virginia Class members"). 248

COUNT LXXXIX (against all Defendants) Strict Products Liability (design defect) 248

COUNT XC (against all Defendants) Strict Products Liability (failure to warn) 251

COUNT XCI (against all Defendants) Violation of the West Virginia Consumer Credit and Protection Act (W. Va. Code § 46A-1-101 et seq.) 252

36. Claims brought on behalf of Class members who installed their turnout gear in Wisconsin ("Wisconsin Class members"). 256

COUNT XCII (against all Defendants) Strict Products Liability (design defect) 256

COUNT XCIII (against all Defendants) Strict Products Liability (failure to warn) 258

PRAYER FOR RELIEF 260

DEMAND FOR JURY TRIAL 261

Plaintiff, the City and County of Butte-Silver Bow, individually and on behalf of all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel and on information and belief as follows.

## I. INTRODUCTION

1. Every day, hundreds of thousands of firefighters work to protect property and save lives. When called to respond, one of their first actions is to don "turnout" or "bunker" gear, which consists of a helmet, hood, jacket, pants, suspenders, boots, gloves, and, when needed, respirators. The turnout gear contains chemicals in the "PFAS" family.

2. Per- and polyfluoroalkyl substances, abbreviated "PFAS," are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, and water.

3. PFAS are known as "forever chemicals" and, per the Stockholm Convention on Persistent Organic Pollutants (to which the United States is a signatory), are defined as: persistent (because they do not break down through organic processes or in the environment); transboundary (as they migrate through surface and ground water, as well as in the atmosphere and through wildlife); and bio-accumulative (as they concentrate within our bodies and are passed to the fetus within the womb and though breast milk). Exposure to PFAS in humans can occur through inhalation, ingestion, and dermal contact.

4. PFAS have been associated with multiple and serious adverse health effects in humans, including cancer, tumors, liver damage, immune system, endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones, and organs.

5. Turnout gear is impregnated with PFAS in the manufacturing process. Firefighters are exposed to PFAS from turnout gear through dermal exposure, the shedding of PFAS during normal use and aging of turnout gear. Firefighters are developing cancer at an alarming rate higher than the general population.

6. Fire fighter occupational cancer is the leading cause of line-of-duty deaths in the fire service.

7. At the 2022 TAFF Fallen Fire Fighter Memorial, almost 75% of the names added to the wall (348 out of 469) were members who had died from occupational cancer.

8. On March 6, 2023, President Joseph R. Biden, speaking in Washington, pledged: "We're going after toxic exposure to PFAS, so-called 'forever chemicals' that for years have been in your gear, your equipment … that you depend on to be able to do your job."

9. Plaintiff brings this action against Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing Company), DuPont de Nemours, Inc., The

Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., Globe Manufacturing Company, LLC, W.L. Gore & Associates, Inc., and Lion Group, Inc. (collectively, "Defendants") for harm resulting from the sale of turnout gear containing PFAS to fire departments and fire responding agencies.

10. 3M and Chemours intentionally manufactured, distributed, marketed, and/or sold PFAS to companies, including Defendants Globe, Gore, and Lion, which also manufacture, distribute, or sell turnout gear without disclosing to Plaintiffs and the putative class the dangers of PFAS that were known to each of those entities.

11. For decades, while fully aware of the health risks posed by PFAS products, Defendants, through a common enterprise (the "PFAS Concealment Enterprise"), sold PFAS-infused products to fire departments and public entities that respond to fires without disclosing the toxicity of turnout gear.

12. Defendants never disclosed to fire departments and public entities using turnout gear that PFAS in turnout gear is extremely dangerous to health, property, and the environment. Instead, those entities collaborated to conceal the truth and such concealment was a common purpose of the PFAS Concealment Enterprise.

13. By way of example, the common purpose and actions of Defendants DuPont and Chemours to hide the truth about PFAS and PFAS-infused products is

exemplified by a 3M Material Safety Data Sheet that 3M had sent to Old DuPont in 1997. To protect workers who are exposed to hazardous chemicals in their work environment, OSHA adopted the Hazard Communication Standard in November 1983. The standard requires chemical manufacturers and importers to evaluate the hazards of chemicals that they produce and distribute. The Hazard Communication Standard requires information about hazards and protective measures to be disseminated on container labels and Material Safety Data Sheets. All employers with employees exposed to regulated chemicals must provide access to the labels and the Material Safety Data Sheets. Employers using the manufactured chemicals must also train employees to understand the information provided by the Material Safety Data Sheets and the labels and how to use the information to protect themselves. The Hazard Communication Standard covers all chemicals in American workplaces.[1]

14. The 1997 Material Safety Data Sheet that 3M sent *only* to Old DuPont stated:

> CANCER:
> WARNING: Contains a chemical which can cause cancer. (3825-24-1) (1983 and 1993 studies conducted jointly by 3M and Dupont).

---

[1] "Hazard Communication in the 21st Century Workforce," Hearing Before the Subcommittee on Employment, Safety, and Training of the Committee on Health, Education, Labor, and Pensions, United States Senate (Mar. 25, 2004), https://www.govinfo.gov/content/pkg/CHRG-108shrg92926/html/CHRG-108shrg92926.htm.

15. The "chemical" referred to in that document was PFOA,[2] which is a particularly harmful PFAS and which 3M and DuPont knew, based on their own joint studies as shown in detail in this Complaint, could cause cancer.

16. Instead of informing the public of those dangers, 3M and DuPont suppressed the 1997 Material Safety Data Sheet as part of the wrongful conduct of the PFAS Concealment Enterprise. A former Minnesota Attorney General testified before a Unites States House Committee about a lawsuit by Minnesota against 3M for PFAS pollution. In part, she testified about the 1997 Material Safety Data Sheet that 3M gave to DuPont.[3] After quoting from the document, she testified that "3M removed the label that same year and for decades sold PFAS products without warning the public of its dangers."[4] Her testimony only concerned 3M, but the same is true of DuPont, which associated with 3M to suppress the truth and to sell PFAS products for decades without warning the public of the dangers of those products.

17. Defendants 3M and DuPont have been forced to pay for some environmental harms caused by their PFAS products, but they have not paid a

---

[2] *See* Robert Bilott, *Exposure* (2019), at 351.

[3] Testimony of Lori Swanson, Former Minnesota Attorney General, Before the Committee on Oversight and Reform, Subcommittee on Environment, United States House of Representatives (Sept. 10, 2019), at 3, https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf. The Material Safety Data Sheet cited by Swanson is attached to that testimony as Exhibit A.

[4] *Id.*

penny for harms caused by turnout gear that was treated with Defendants' PFAS products. For example, 3M has agreed to pay $10.3 billion to settle claims that it contaminated public water systems with PFAS, while Old DuPont, Chemours, and Corteva, Inc. agreed to pay $1.19 billion to settle similar claims.[5] Objections to the settlement were filed by "22 governments and agencies in New York, Texas, Colorado, California and elsewhere. They said the settlements will not fully cover cleanup and legal costs facing water providers after the companies allegedly polluted drinking water with per- and polyfluoroalkyl substances, or PFAS."[6]

18. Other examples are the $12 million class action settlement by 3M and Daikin in 2022 to resolve claims they contaminated residential water sources in Alabama. And 3M and another company agreed to a $54 million settlement with property owners in Michigan whose homes are atop toxic PFAS contamination.

19. All of the Defendants either manufactured or sold, at some point during the class period, a range of products that use PFAS in addition to turnout gear. In addition, each of the Defendants in the manufacturing process of turnout gear and other products pollute their manufacturing sites with PFAS, causing water pollution in the water systems near their manufacturing sites. Beginning as early as 2000, in the case of 3M and DuPont, and at later times for other Defendants, each

[5] Clark Mindock, "3M, DuPont PFAS settlements called inadequate by cities, other objectors," Reuters (Nov. 13, 2023), https://www.reuters.com/legal/litigation/3m-dupont-pfas-settlements-called-inadequate-by-cities-other-objectors-2023-11-13/.

[6] *Id.*

Defendant was gravely concerned that any admission regarding the toxicity of turnout gear or PFAS-laden products would expose them to liability not only for turnout gear, but would (1) call into question PFAS toxicity in for a wide range of products they sold and with respect to manufacturing sites for such products and (2) encourage competition in that other companies would compete by developing turnout gear without PFAS. Fearful of these developments, which could expose them to billions in additional liabilities and create competitors with their product lines, each of the Defendants entered into an agreement to form an enterprise, the purpose of which was to conceal the dangers of PFAS and PFAS in turnout gear.

20. Although some Defendants have paid billions of dollars as a result of water pollution from their PFAS production, Defendants in this action have not paid a dime for selling turnout gear infused with PFAS to fire departments. Plaintiff files this action to remedy that injustice. The presence of PFAS in turnout gear requires that the PFAS-impregnated gear be replaced as soon as possible. The cost of turnout gear (excluding respirators) is approximately $3,000 per suit, with many departments providing two suits for each firefighter. There are approximately 1,042,000 firefighters in the United States, so replacement costs could and should run into the billions.

21. Plaintiff, on behalf of a class of fire departments and responding agencies who bought turnout gear treated/infused with PFAS, brings claims under

the Racketeering Influenced and Corrupt Organization Act ("RICO") and various state laws seeking damages in the form of money to replace turnout gear and a corrective notice to all members of the class that provides a proper warning regarding the dangers of PFAS-infused turnout gear.

## II. PARTIES

### A. Plaintiff

22. Plaintiff, the City and County of Butte-Silver Bow, in the state of Montana, is a consolidated city and county government. Butte was established as a mining camp in the early 1860s and quickly became the nation's largest supplier of copper, attracting immigrants from around the world to work in Butte's mines. In 1977, the city and county governments consolidated to form the sole entity of Butte-Silver Bow ("BSB"), encompassing 717 square miles. The City and County of Butte-Silver Bow continues to operate as a consolidated city-county government in Southwest Montana. Its current total population is estimated at nearly 36,000.

23. The Butte Fire Department opened its first fire station in 1883 and today the Butte-Silver Bow Fire Department ("BSBFD") employs 176 full-time and volunteer fire fighters and supports nine volunteer fire departments throughout both the city and the county. Over the years, BSBFD has responded to wildfires and structure fires in addition to medical emergencies, automobile accidents, aircraft crashes, and other emergencies. The department is professionally run and

managed, and provides organizational structure and expert advice to various volunteer fire departments. BSBFD is an active department, responding on average to at least one structure fire per week.

24. BSBFD currently owns approximately 400 sets of turnout suits to protect its full-time firefighters and volunteers. Within the full-time cadre, BSBFD typically has available two sets of turnout gear per fire fighter for emergency response. After each deployment where gear is used as intended, such as responding to a structure or other fire, it must be washed and dried prior to use on another emergency run. BSBFD currently uses turnout gear manufactured by Defendants Lion Group, Inc. and Globe Manufacturing Company, LLC.

25. Within Butte-Silver Bow, the BSBFD serves the communities of Butte, Buxton, Centerville, Divide, Melrose, Ramsay, Rocker, Silver Bow, and—although Walkerville is a separate municipality—BSBFD assists the community when requested. The volunteer fire departments include Big Butte, Boulevard, Centerville, Floral Park, Home Atherton, Little Basin Creek, Racetrack, Rocker, and Terra Verde.

26. The mission of the Fire Department is to provide the highest level of fire protection by means of prevention, suppression, and education. Divisions within the department include suppression, prevention, training, communications, and maintenance. The functions of the Fire Department include providing

manpower and equipment to suppress fires, fire prevention services, building inspections, fire investigation, and delivery of emergency medical services.

27. The BSBFD is served by 36 full-time firefighters and over 125 volunteer fire department personnel.

28. BSBFD has purchased turnout gear sold by Globe and Lion, with purchases being made from 2008 through 2024. Most BSBFD's firefighters have a primary set of gear and a spare.

**B. Defendants**

29. Defendant 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States, including in Montana. 3M has its principal place of business in St. Paul, Minnesota.

30. Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation that does business throughout the United States, including in Montana. New DuPont has its principal place of business in Wilmington, Delaware.

31. Defendant The Chemours Company ("Chemours") is a Delaware corporation that does business throughout the United States, including in Montana. Chemours has its principal place of business in Wilmington, Delaware. In 2015, Old DuPont spun off its performance chemical business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain

Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit.

32. Defendant The Chemours Company, FC, LLC ("Chemours FC") is a Delaware limited liability company that does business throughout the United States, including in Montana. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours and manufactures certain materials and/or chemicals that are the subject of this lawsuit.

33. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including in Montana. Corteva has its principal place of business in Indianapolis, Indiana. In 2019, New DuPont spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit. This Complaint refers to DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc. collectively as "DuPont."

34. Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire limited liability company that does business throughout the United

States, including in Montana. Globe has its principal place of business in Pittsfield, New Hampshire. Globe, at times relevant to this action, sold turnout gear with PFAS.

35. Defendant W. L. Gore & Associates, Inc. ("Gore") is a Delaware corporation that does business throughout the United States, including in Montana. Gore has its principal place of business in Newark, Delaware. Gore, at times relevant to this action, sold turnout gear with PFAS.

36. Defendant Lion Group, Inc. ("Lion") is an Ohio corporation that does business throughout the United States, including in Montana. Lion has its principal place of business in Dayton, Ohio.

37. Plaintiff alleges that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused injuries to Plaintiff and members of the Class, as alleged herein.

38. Plaintiff alleges that each named Defendant derived substantial revenue from the equipment, materials, and/or chemicals that are the subjects of this lawsuit. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the equipment, materials, and/or chemicals in Montana and caused harm to Plaintiff and members of the Class in Montana.

39. Defendants expected or should have expected their actions to have consequences in Montana.

40. Defendants purposefully availed themselves of the privilege of conducting activities in Montana, thus invoking the benefits and protections of its laws.

## III. JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interests and costs, and the Plaintiff and most members of the proposed Class are citizens of a state different from each Defendant. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this case asserts claims under 18 U.S.C. § 1964(a).

42. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to this Complaint took place within this District.

43. This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts, and/or committed overt acts in furtherance of the conduct alleged in the Complaint throughout the United States,

including within Montana. The conduct was directed at, or had the effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including within Montana.

## IV. SUBSTANTIVE ALLEGATIONS

### A. General Allegations Regarding Per- and Polyfluoroalkyl Substances

44. Per- and polyfluoroalkyl substances ("PFAS" or "PFAS Chemicals") are a class of synthetic chemical compounds that consist of nearly indestructible chains of carbon and fluorine atoms.

45. PFAS do not exist naturally in the environment.

46. PFAS were first developed in the 1930s and 1940s.

47. PFAS' high chemical and thermal stability have led to their use in a wide range of commercial products and industries.

48. PFAS' same qualities cause them to persist in the environment and in the human body for long (if not indefinite) periods of time, earning them the nickname "forever chemicals."

49. In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to absorb into and bioaccumulate in the human body.

50. Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

51. Peer-reviewed scientific research reflecting the best and most recent scientific information available has concluded that nearly any amount of PFAS exposure is hazardous to human health.

52. PFAS exposure in humans can occur via dermal absorption, as well as ingestion and inhalation. PFAS also crosses the placenta from mother to fetus and by passing to infants through breast milk.

53. When exposed to heat, PFAS can off-gas, break down, and degrade into highly mobile and toxic particles and dust,[7] *increasing* the risk of PFAS exposure via dermal absorption, ingestion, and inhalation.

54. PFAS exposure has been linked to multiple, serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

55. PFAS have been found to concentrate in human blood, bones, and organs.

56. Perfluorooctanoic Acid ("PFOA") and other PFAS bioaccumulate in humans' blood and organs, including the kidneys and the liver.

---

[7] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://pubmed.ncbi.nlm.nih.gov/33542478/.

57. PFOA and other PFAS interfere with the human body's functions, including the functions of the organs and immune systems, leading to adverse health outcomes.

58. Negative health effects may occur because of exposure to PFOA and other PFAS at levels below most laboratories' ability to detect at this time.

59. The following is a non-exhaustive list of adverse health outcomes that can result from exposure to PFOA and other PFAS, many of which can manifest after years of exposure:

a. increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder cancer, breast cancer, and ovarian cancer;

b. reduced ability of the body's immune system to fight off infections, including reduced vaccine response;

c. interference with the body's natural hormones and liver enzymes;

d. changes in liver enzymes;

e. reproductive effects including decreased fertility;

f. developmental effects or delays in children, including low birthweight, accelerated puberty, bone variations, or behavioral changes;

g. increased cholesterol levels and/or risk of obesity;

h. increased risk of high blood pressure or pre-eclampsia in pregnant women; and

i. interference with and suppression of vaccine response (decreased serum antibody concentrations) in children.

60. PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

61. The United States Environmental Protection Agency ("EPA") has classified PFOA as likely human carcinogens.

62. The EPA has concluded that there is *no safe level* of PFOA exposure in human beings.

63. In 2022, the EPA initiated a proposed rulemaking to designate PFOA and other PFAS as a hazardous substance under the Comprehensive Environmental Response, Compensation, and Liability Act. In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

64. On or around April 10, 2024, the EPA finalized a National Primary Drinking Water Regulation (NPDWR) establishing legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water. The EPA also finalized health-based, non-enforceable Maximum Contaminant Level

Goals (MCLGs) for the six PFAS. Notably, the MCLGs for both PFOA is listed as "Zero":

| Compound | Final MCLG | Final MCL (enforceable levels) |
|---|---|---|
| PFOA | Zero | 4.0 parts per trillion (ppt) (also expressed as ng/L) |
| PFOS | Zero | 4.0 ppt |
| PFHxS | 10 ppt | 10 ppt |
| PFNA | 10 ppt | 10 ppt |
| HFPO-DA (commonly known as GenX Chemicals) | 10 ppt | 10 ppt |
| Mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS | 1 (unitless)<br>Hazard Index | 1 (unitless)<br>Hazard Index |

65. The International Agency for Research on Cancer has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

66. In 2022, the California Office of Environmental Health Hazard Assessment listed PFOA as a chemical known to the state of California to cause cancer.

67. PFAS includes polytetrafluorethylene ("PTFE"), one of the most well-known and commonly used PFAS Chemicals.

68. The use of fluoropolymers (including PTFE) in manufacturing and commercial products poses substantial risks to human health.

69. When PTFE is used in commercial products such as textiles, other PFAS used in the manufacturing process will generally be present and pose substantial risks to human health.

70. Peer-reviewed scientific research has cautioned that:

a. "there is no sufficient evidence to consider fluoropolymers as being of low concern for environmental and human health";

b. "a blanket statement that [fluoropolymers] cannot enter cells is factually inaccurate";

c. "there is no scientific basis to separate and subsequently remove fluoropolymers from discussions of other PFAS as a class or in terms of their impacts on human or environmental health";

d. "[t]he conclusion that all fluoropolymers are of low concern … ignores major [PFAS] emissions linked to their production," among other issues; and

e. "it would be impossible to verify the safety of all fluoropolymer products n the market based on the information available in the public domain."

71. The use of fluorinated polymers in manufacturing and commercial products poses substantial risks to human health.

72. The use of fluorinated polymers in manufacturing and commercial products such as textiles can lead (and often leads) to the formation of non-polymeric PFAS (e.g., PFOA and PFOS), which can then contaminate (and often contaminate) human beings, as well as the environment.

73. The EPA has denied certain exemptions to side-chain fluorinated polymers as a result of the serious risks involved in their use.[8]

74. The EPA has cautioned that it "can no longer conclude that [side-chain fluorinated polymers] 'will not present an unreasonable risk to human health or the environment.'"[9]

**B. General Allegations Regarding PFAS-Containing Turnout Gear**

75. Plaintiff and members of the class have employees who, as first responders to fire, hazardous materials incidents, and other emergency and medical calls, risk their lives on a daily basis. They not only save lives and protect property, but they also provide emergency services and medical care, perform rescues, and offer support to people in traumatic circumstances. To prepare them for and protect them during this enormously challenging work, fire fighters wear turnout gear and receive extensive and ongoing training in fire suppression.

---

[8] EPA, *Premanufacture Notification Exemption for Polymers; Amendment of Polymer Exemption Rule to Exclude Certain Perfluorinated Polymers*; 2010; Vol. 75, https://www.federalregister.gov/documents/2010/01/27/2010-1477/premanufacture-notification-exemption-for-polymers-amendment-of-polymer-exemption-rule-to-exclude.

[9] *Id.*

76. Turnout gear is the personal protective equipment (PPE) used by fire fighters, depicted below. During their training, and when responding to fires, fire fighters wear turnout gear intended to provide limited thermal, chemical, and biological protection.

77. Turnout gear includes several components, namely helmets, hoods, jackets, pants (with suspenders), boots, and gloves.

78. These components are made up of three layers: a durable water repellant outer shell, a middle moisture barrier, and an inner thermal liner closest to the wearer's skin.

79. The primary purpose of the outer shell is to protect the fire fighter from direct flame.

80. The primary purpose of the middle moisture barrier is to block the penetration of water, liquid chemicals, and heat, while also allowing perspiration and body heat to escape. Liquid resistance and vapor permeability are particularly important for the prevention of steam burns, which can occur if water and heat get trapped inside the turnout gear.

81. The primary purpose of the thermal liner is to protect the fire fighter from ambient heat.

82. Peer-reviewed scientific research has confirmed that *all three* layers of the turnout gear contain PFAS.

83. In a 2020 study conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"),[10] turnout gear (specifically, jackets and pants) was collected from fire fighters across the United States and tested. The study included turnout gear manufactured by Defendants Globe and Lion, as well as turnout gear manufactured with specialty fabrics from Defendant Gore, over several production years.

84. In the Peaslee study, the researchers found significant quantities of PFAS in every layer of both new (still in the original packaging) and used turnout gear.

85. In "every textile sample tested," the researchers found "very high" total fluorine levels (a reliable indicator of total PFAS concentration) in both the moisture barrier and outside shell layers.[11]

86. The turnout gear also contained significant levels of a number of other PFAS, including PTFE.

87. In the middle moisture barriers, total fluorine levels were typically greater than 30%, a result too high to be quantified by particle-induced gamma-ray emission and consistent with use of PTFE in the middle moisture barriers.

---

[10] Graham F. Peaslee, et al., "Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles," Environmental Science & Technology Letters 2020, 7, 8, 594-599 (June 23, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410.

[11] *Id.*

88. In all three layers of tested turnout gear, PFOA was present at alarmingly high levels—for instance, in one set of gear that was tested, the outer shell contained 182 parts per billion and the thermal liner contained 78 parts per billion.

89. To put these numbers into perspective, the EPA has set the MCL for PFOA in drinking water at 4 parts per trillion. The amount of PFOA present in the turnout gear that was tested was 182,000 parts per trillion (182 parts per billion) in the outer shell and 78,000 parts per trillion (78 parts per billion) in the thermal liner. In the thermal liners, "significant fluorine signatures" were found, indicating that "PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[12]




Credit: *Environ. Sci. Technol. Lett.*

[12] *Id.*

90. "Startingly, garment-to-hand transfer of total fluorine [] was also observed when researchers simply manipulated the textiles in our laboratory," which is an observation that "strongly supports the premise that side-chain fluoropolymers and the PFAS they bind do release to the environment upon wear."[13]

91. Lead researcher Graham Peaslee commented that fire fighter turnout gear is composed of "the most highly fluorinated textiles [he had] ever seen"[14] and that the level of PFAS in the turnout gear means that fire fighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high[.]"[15]

92. Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in fire fighters, with dermal absorption through direct contact between the fire fighters' skin and turnout gear being "a key exposure route."[16]

---

[13] *Id.*

[14] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.

[15] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

[16] G.E. Campbell, et al., *PFAS-free Moisture Barriers in Structural Firefighting Gear, in Toward a PFAS-free Future: Safer Alternatives to Forever Chemicals*, Green Chemistry Series No. 81 (Simona A. Bălan, Thomas A. Bruton, and Kimberly G. Hazard, ed., 2024).

93. Occupational cancer is presently the leading cause of line-of-duty death in the fire service.[17]

94. Over the past thirty to forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.[18]

95. From 2015 to 2020, 75% of the fire fighters added to the IAFF Fallen Fire Fighter Memorial died from occupational cancer.

96. Seventy percent of firefighters are predicted to die eventually from cancer, which is significantly higher than the general population.[19]

**C. Defendants' Contributions to PFAS-Containing Turnout Gear**

97. In 1938, a chemist employed by Defendant DuPont invented PTFE. Less than a decade later, DuPont commercialized PTFE.

98. By the 1950s, PFAS were widely used in commercial manufacturing, including by Defendants 3M and Dupont. Prior to the 1950s, PFAS had never been detected in the bodies or blood of human beings.

99. Since the 1950s, 3M and Dupont have continued to manufacture, market, and sell PFAS.

100. In 1966, Defendant Globe began manufacturing, marketing, and selling turnout gear containing PFAS.

[17] Peaslee, *supra* note 12.
[18] *Id.*
[19] *Id.*

101. Since 1966, Globe has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M, DuPont, Gore, and PFAS manufactured by Defendants 3M and/or DuPont.

102. In 1969, Robert Gore, an employee of his father's company, Defendant Gore, invented an expanded form of PTFE ("ePTFE"). Shortly thereafter, Gore commercialized ePTFE.

103. In 1970, Defendant Lion began manufacturing, marketing, and selling turnout gear containing PFAS.

104. Since 1970, Defendant Lion has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont and Gore and PFAS manufactured by Defendants 3M and/or DuPont.

105. In 2013, DuPont announced that it was planning to spin off its "performance chemicals business" into a new publicly traded company, which ultimately became Defendant Chemours.

106. In 2015, Chemours began manufacturing, marketing, and selling performance chemicals, including PFAS.

107. Since 2015, Chemours has continued to manufacture, market, and sell performance chemicals, including PFAS.

108. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold PFAS and the turnout gear worn by Plaintiff, and members of the Class and/or the PFAS-containing materials therein and/or the PFAS therein.

109. Defendants 3M and DuPont expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiff and members of the Class.

110. Defendants 3M, DuPont, and Gore expected their PFAS-containing materials to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiff and members of the Class.

111. Defendants Globe and Lion expected their turnout gear to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiff and members of the Class.

//

//

## D. Defendants' Knowledge of the Dangers of PFAS

### 1. Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS

112. Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

113. 3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

114. As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. The findings of these studies were discussed internally (and often shared with DuPont), but they were not publicized or shared with any regulatory agencies. Notably:

a. In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

b. In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

c. By the 1970s, 3M had documented PFAS in fish and were aware that PFAS were hazardous to marine life.

d. In 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about potential health effects.

e. In 1978, 3M conducted multiple PFAS studies in monkeys and rats. The studies showed that PFAS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

f. In 1979, an internal 3M report stated that the PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies [] be undertaken as soon as possible."[20]

g. In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."[21]

h. In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal researching showing that PFAS were causing birth defects in rats.

---

[20] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, The Intercept (July 31, 2018), https://www.typeinvestigations.org/investigation/2018/07/31/3m-knew-dangers-pfoa-pdos-decades-ago-internal-documents-show/.

[21] *Id.*

i. In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

j. In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

115. Section 8(e) of the Toxic Substances Control Act (TSCA) requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in the TSCA since its enactment in 1976. *See* Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

116. Despite the decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

117. In 1998, the EPA first learned that PFAS was in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

118. In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOA and other PFAS.

119. In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[22]

120. The same year, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, 3M fell far short of transparency: Mike Roman, 3M's chairman and chief executive officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve."[23] In connection with the announcement, 3M falsely maintained that "3M's products are safe for their intended uses."[24]

---

[22] *California sues 3M, DuPont over toxic 'forever chemicals'*, CNN (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

[23] *3M to Exit PFAS Manufacturing by the End of 2025*, 3M (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025#:~:text=3M%20will%3A,obligations%20during%20the%20transition%20period.

[24] *Id.*

### 2. Defendant DuPont's Long-Standing Knowledge of the Dangers of PFAS

121. Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

122. Dupont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

123. In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[25]

124. In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."[26]

125. As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment.

Notably:

a. In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house

[25] Sheron Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception*, The Intercept (Aug. 11, 2015), https://theintercept.com/2015/08/11/dupont-chemistry-deception/.
[26] *Id.*

researchers at DuPont had confirmed that PFOA was associated with the enlargement of various, specific organs in rats.[27]

b. In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to a poison.

c. In 1978, Dupont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns, including increased rates of endocrine disorders.

d. By 1979, Dupont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[28]

e. In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the

[27] *Id.*
[28] *Id.*

results of a 3M study which suggested an association between PFAS exposure and birth defects.

f. By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[29]

g. By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h. In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[30]

---

[29] *Id.*

[30] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, The New York Times Magazine (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

i. In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included study finding an association between prostate cancer and exposure to PFOA.[31]

126. In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[32]

127. In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

128. In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

---

[31] Lerner, *supra* note 22.

[32] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit Meeting Minutes (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia. …
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[33]

129. In 2005, the EPA reached a settlement with Dupont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25 million, and further required DuPont to perform supplemental environmental projects worth $6.25 million.

130. In 2015, DuPont spun off its "performance chemicals" business, as well as two-thirds of its environmental liabilities and 90% of its active litigation to Defendant Chemours.

[33] Letter from P. Terrance Gaffney, Esq. of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

131. In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

132. In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing DuPont, along with 3M, for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role and maintain that California's claims were without merit:

> DuPont has never manufactured PFOA, PFOS or firefighting foam, said spokesperson Daniel Turner, referring to two PFAS substances. He added the company believes the complaint incorrectly names it as a defendant. "We believe these complaints are without merit … We look forward to vigorously defending our record of safety, health and environmental stewardship."[34]

**3. The Remaining Defendants' Knowledge of the Dangers of PFAS**

133. Defendant Gore openly advertises that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]."[35] For example, in efforts to garner support for its open, long-standing commercial use of PTFE, Gore asserts:

---

[34] *California sues 3M, DuPont over toxic 'forever chemicals'*, *supra* note 24.

[35] *Gore's Commitment to Material Stewardship*, GORE, https://www.gore.com/about/materials-stewardship.

> The present paper brings together fluoropolymer toxicity data, human clinical data, and physical, chemical, thermal, and biological data for review and assessment to show that fluoropolymers satisfy widely accepted assessment criteria to be considered as "polymers of low concern" (PLC) and to show that fluoropolymers are distinctly different enough from other classes of PFAS to not be grouped with them for hazard assessment or regulatory purposes.
>
> Scientists, regulators, and concerned communities often fall into one of two groups: one says all PFAS should be banned and the other says PFAS are so different that each must be evaluated, classified, and regulated individually. Barbara J. Henry, PhD, a toxicologist with [Gore], says there's a middle way forward if PFAS are grouped by their properties.[36]

134. Defendants have continued to misrepresent the safety of PFAS and engaged in campaigns aimed to direct the public's attention away from the issue of PFAS in their products.

135. Defendant 3M maintains and publicly advertises that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."[37]

136. 3M maintains and publicly advertises that:

> Researchers from around the world have studied these materials for decades and haven't found a definitive causal relationship between PFOA or PFOS exposure and any health condition … . While some research shows that these materials are associated with negative health

[36] *Id.*

[37] *Health, Safety & Environmental Stewardship*, 3M, https://pfas.3m.com/health-safety-and-environmental-stewardship.

> outcomes, other studies don't reach the same conclusions.[38]

137. Defendant New DuPont maintains and publicly advertises that:

> In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFOS or firefighting foam. While DuPont is not a PFAS commodity chemical manufacture, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society.[39]

138. Defendant Chemours maintains and publicly advertises that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030." Chemours further maintains and publicly advertises that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."[40]

---

[38] *How Fluorochemistries Are Safely Used*, 3M, https://pfas.3m.com/how-fluorochemistries-are-safely-used.

[39] *DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS)*, DuPont, https://www.dupont.com/pfas.html.

[40] *Our Commitment to Responsible Chemistry*, CHEMOURS, https://www.chemours.com/en/sustainability/sustainability-safety/our-commitment-to-pfas-stewardship.

139. In 2017, Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of The Columbus Dispatch demanding the newspaper's *retraction* of a story headlined "Lawyer: Firefighters' gear may be hazardous." Schwartz asserted:

> PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish … . [B]ecause these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear. However, based on all available scientific data, such nominal trace amounts … would not have posed any health risks to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear. …
>
> We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks … . However, the elevated risks derives from the hazardous substances produced by the fire, not the turnout gear that protects firefighters.

140. In 2017, Defendant Lion launched its "NOT IN OUR HOUSE" initiative to "spread awareness of the cancer threat facing the fire service" and "educat[e] firefighters on the actions they can take to reduce their exposure to cancer-causing agents."

141. In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion turnout gear continues to be safe and ready

for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job":

**HERE'S ALL YOU NEED TO KNOW ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PFTE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

**LION does not use PFOA or PFOS in our turnout gear or any of our protective products.**

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

142. In 2019, Defendant Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."

143. In 2020, Paul Chrostowski, Ph.D., a consultant hired by Defendant Lion, took out a full page in the publication Firefighter Nation to argue that turnout gear is completely safe and that any evidence to the contrary, including the Peaslee study, is unreliable fearmongering. Chrostowski argued:

> The evidence [] shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their

> turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population … .
>
> At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.

144. In 2021, Defendant Lion confirmed that the representations articulated by Chrostowski reflect the company’s position.

145. In 2021, Defendant Gore maintained in a New York Times article that its turnout gear products were safe for wearers.

146. In 2022, Defendant 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

147. Moreover, Defendants have repeatedly represented to Fire Fighter unions and the public that their products are safe for their intended uses, including the ways in which Plaintiff has alleged they were used.

148. For example, Defendant DuPont maintains and publicly advertises that turnout gear manufactured with DuPont’s materials “work hard to help keep your professionals safe, inside and out,” “help protect professionals even when the fire is out,” and “are helping keep first responders safe.”

149. Fire-Dex, a not-yet-named defendant, maintains and publicly advertises that its turnout gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] [] carcinogen exposure." Fire-Dex advertises that the company goes "beyond industry standards to ensure a proper fit for your comfort and safety," making its turnout gear products "key to keeping your crew safe!"

150. Defendant Globe maintains and publicly advertises that the company is "committed to firefighter health & safety" and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.

151. Defendant Gore maintains and publicly advertises that the company's protective fabrics enable fire fighters "to stay safe and engaged," emphasizing that to do their jobs, fire fighters "need protective garments that keep them protected with a limited amount of physiological burden."

152. Another manufacturer, Honeywell, maintains and publicly advertises that its fire fighter turnout gear is "[d]esigned to provide safety," referring to its turnout gear products as "the pioneer of safety by design."

153. Defendant Lion maintains and publicly advertises that the company "makes the gear emergency service providers, civilian responders and militaries

need to stay safe in the line of duty," emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

154. Another manufacturer, StedFast, maintains and publicly advertises that all of its products "are manufactured with safety in mind," asserting that "[k]eeping people safe is a core value of our business."

**E. Defendants' Failure to Provide Safety Warnings on Product Labels**

155. As alleged above, the turnout gear does not contain any labeling information or warnings:

a. indicating that the gear contains or may contain PFAS,

b. indicating that the gear specifically contains or may specifically contain PFOA,

c. regarding the health risks associated with exposure to PFAS, or

d. regarding the health risks associated with exposure to PFOA.

156. Below are photos typical of warning labels for turnout gear designed, manufactured, marketed, sold, and distributed by Globe, Honeywell, and Lion. As depicted below, the labels do not disclose that the turnout gear contains PFAS or PFAS-containing materials, and contain no warning that handling, wearing, or using the turnout gear as it was intended to be handled, worn, or used can result in exposure to PFAS and adverse effects to human health.


DANGER
DO NOT USE THIS GARMENT IF YOU HAVE NOT READ AND UNDERSTOOD THE ENTIRE FEMSA OFFICIAL USER INFORMATION GUIDE AND ALL LABELS FOR FIRE FIGHTING PROTECTIVE GARMENTS!
• Fire fighting is an ULTRA HAZARDOUS, UNAVOIDABLY DANGEROUS activity. Neither this garment nor any other will protect you from all burns, injuries, diseases, conditions or hazards. No protective garment can replace proper training and constant practice in fire fighting tactics and safety. Consistent with OSHA regulations, this garment is offered for fire departments (paid or volunteer) or other employers to evaluate and decide for themselves whether or not it provides an acceptable level of protection for their emergency operations. You may be KILLED, BURNED, INJURED OR SUFFER DISEASE OR ILLNESS with NO WARNING and NO SIGN of damage to this garment.
• You will increase your risk of DEATH, BURNS, INJURY, DISEASE OR ILLNESS if you do not strictly comply with the entire FEMSA OFFICIAL USER INFORMATION GUIDE and all LABELS.
• Wearing this or any protective garment may increase your risk of heat stress which may cause heart attack, stroke, dehydration, or other conditions resulting in DEATH, INJURY OR ILLNESS.
• You may NOT feel heat under this garment before suffering a BURN. This garment will lower your ability to feel heat. Be constantly alert to the possibility of exposure to heat and other hazards.
• If this or any protective garment is exposed to heat or comes in contact with a hot surface, you may be BURNED underneath the garment with NO warning and NO sign of damage to the garment.
• Do NOT use this protective garment if it is soiled, torn, abraded, worn or altered from its original condition. Do NOT use this garment unless it has been properly inspected and maintained by your fire department or employer. Such use may result in DEATH, BURNS, INJURY, DISEASE OR ILLNESS.
• This garment is designed to be used as a unit. All garment components (outer shell, moisture barrier, thermal barrier, etc.) MUST be used and all garment closures (flaps, buttons, hooks, collars, etc.) MUST be fastened when in use. Failure to do so may result in DEATH, BURNS, INJURY, DISEASE OR ILLNESS.
• This garment is NOT warranted to be fit for a particular purpose. Read carefully the "Warranty Information" in the FEMSA OFFICIAL USER INFORMATION GUIDE.
• If you do not have a FEMSA OFFICIAL USER INFORMATION GUIDE, contact the manufacturer.
DO NOT REMOVE THIS LABEL
Globe Firefighter Suits
37 LOUDON ROAD
PITTSFIELD, NEW HAMPSHIRE USA 03263
Tel : 603-435-8323 Fax : 603-435-6388
"THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE GARMENT REQUIREMENTS OF NFPA 1971, 2018 EDITION."
"FOR COMPLIANCE WITH THE STRUCTURAL FIRE FIGHTING GARMENT REQUIREMENTS OF NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE WORN IN CONJUNCTION WITH THIS GARMENT."
Outer Shell: DEFENDER 750, NATURAL
Thermal Liner: QUANTUM 3D SL2i
Moisture Barrier: CROSSTECH BLACK, 2F
DRD is installed between shell and liner.
Liner is attached at neckline, facings, and cuffs.
Model: CLASSIX JACKET Ser.#: 5574133
Style: K0753G10 Date: 10 / 2018
Size: 44 Length: 32 Cut: J3615C
Name: [redacted] Made in the USA
WASH/DRY LINERS AND SHELLS SEPARATELY WITH ALL CLOSURES FASTENED. USE MILD DETERGENT WITH pH OF 7 TO 10, MAXIMUM TEMPERATURE OF 105F AND SPIN CYCLE NO GREATER THAN 100G'S. HANG TO DRY IN SHADED AREA. DO NOT DRY CLEAN. DO NOT USE CHLORINE BLEACH; DO NOT STORE IN DIRECT LIGHT. DISCOLORATION TO ANY COMPONENT MAY INDICATE PROTECTIVE QUALITIES HAVE BEEN COMPROMISED. CLOTHING MUST BE INSPECTED, CLEANED, AND MAINTAINED IN ACCORDANCE WITH NFPA 1851 AND FEMSA USER GUIDES.
CLASSIFIED UL
PROTECTIVE GARMENT FOR STRUCTURAL FIRE FIGHTING IN ACCORDANCE WITH NFPA 1971-2018
49F9
MEETS OR EXCEEDS CAL-OSHA STDS
TITLE 8 ARTICLE 10.1 SEC. 340
DO NOT REMOVE THIS LABEL


DANGER
DO NOT USE THIS GARMENT IF YOU HAVE NOT BEEN PROPERLY TRAINED AND SUPERVISED IN ITS USE! ALL EMERGENCY OPERATIONS ARE EXTREMELY HAZARDOUS AND DANGEROUS. DESPITE THE PROTECTIVE QUALITIES OFFERED BY THIS PROTECTIVE GARMENT YOU MAY STILL BE KILLED, INJURED, BECOME ILL OR BE EXPOSED TO HAZARDOUS SUBSTANCES WITH NO WARNING/ SIGN OF DAMAGE TO THIS GARMENT.
IN ORDER TO REDUCE - BUT NOT ELIMINATE - YOUR RISKS, YOU MUST NOT WEAR THIS GARMENT UNLESS:
1) You have read, fully understood, and strictly follow: the USER INFORMATION GUIDE and all LABELS for this garment; the standards listed on the garment certification label; and applicable National, State/Provincial and Local regulations pertinent to emergency operations.
2) Your department, organization or employer has conducted a risk/hazard assessment and determined that this garment provides an acceptable level of protection for the intended application.
3) You have been trained and understand that not all garments provide every level of protection and how to select and properly use the appropriate garment to meet the expected exposure.
4) You understand the limitations of this protective garment and the hazards that it can create while providing protection; in particular: (a) you recognize that you may not feel heat under this garment before suffering a BURN, even when contacting a hot surface, (b) that the garment will lower your ability to feel heat and you may be burned underneath the garment with NO warning and NO sign of damage to the garment, and (c) that this protective garment may increase your risk of heat stress which may cause heart attack, stroke, dehydration, or other conditions resulting in injuries, illness or DEATH.
5) Where applicable, all garment layers and components are in place, all closures are secured, and any special features are properly deployed.
6) The garment is properly inspected, maintained and cared for by your department, organization or employer consistent with the Morning Pride Manufacturing's instructions and applicable National, State/Provincial and Local regulations , and is free of soiling, contamination, damage, and any alteration that would compromise its protective value.
7) The garment is worn as a part of an overall protective ensemble that includes other appropriate protective elements
8) That contamination of this garment may warrant its disposal.
9) This garment is NOT warranted to be fit for a particular purpose. Read carefully the "Warranty Information" in the USER INFORMATION GUIDE.
Honeywell
#1 INNOVATION CT
DAYTON, OHIO 45414
USA 1-800-688-6148
MORNING PRIDE MFG., LLC., DBA HONEYWELL FIRST RESPONDER PRODUCTS
THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE GARMENT REQUIREMENTS OF NFPA 1971, 2013 EDITION. DO NOT REMOVE THIS LABEL
CLASSIFIED UL
PROTECTIVE GARMENT FOR STRUCTURAL FIRE FIGHTING IN ACCORDANCE WITH NFPA 1971-2013
#59F1
PROUDLY MADE IN THE USA
FOR COMPLIANCE WITH THE STRUCTURAL FIRE FIGHTING GARMENT REQUIREMENTS OF NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE WORN IN CONJUNCTION WITH THIS GARMENT: COMPLIANT OUTER SHELL AND LINER SYSTEM.
Serial # 1503000037
Model # LTO24CDTN
OS Brigade 750 - 7.5 osy
TL Spun Aramid / 2-Layer Spu
MB 5.2 oz Stedair 3000
Mfg Date 03/02/2015
Wash/dry shell and liner separately. Use mild detergent with pH between 7 and 10. Hang dry when possible. No wash water/dryer temperatures above 105F (40C). No chlorinated bleaches or solvents. No spin rates over 100 Gs. Store out of direct or indirect sunlight. Reduce exposure to fluorescent light. See NFPA 1851 and USER INFORMATION GUIDE for more details.
Size: Chest 42 Front 30 Back 36 Sleeve 32.0
Originally manufactured for and Property of:




## F. Defendants' Ability to Design Safer Turnout Gear

157. PFAS-free turnout gear was, at all relevant times, technologically and economically feasible.

158. In fact, certain companies now offer PFAS-free options for waterproof fabrics, durable fabrics, and/or outer shells in turnout gear.

159. For example, in or around 2021, Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent

potential to "greatly increase the availability of PFAS-free water-repellant garments."[41]

160. In or around 2021, Todd Herring, Vice President of Product Innovation and Strategy at Fire-Dex, stated in a press release that the company had "partnered with Milliken to develop a non-fluorinated version of our exclusive materials … that meets the increasing market demand for PFAS free PPE material options."[42]

161. In or around 2021, Deana Stankowski, Senior Offering Manager for first responder gear at Honeywell spoke out about Honeywell's newly available PFAS-free outer shell layer "options," explaining: "We are making sure that we have every PFAS-free outer shell available in the market as *part of our portfolio* … . We have customers field testing PFAS-free outer shells, and we will eventually transition over completely to PFAS free." Stankowski added:

> There's no reason to offer both options … . Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way … . The color fastness and wear remain the same.[43]

---

[41] *WL Gore to release PFAS-free waterproof material for apparel*, Enhesa (Oct. 4, 2021), https://product.enhesa.com/346695/wl-gore-to-release-pfas-free-waterproof-material-for-apparel.

[42] *Fire-Dex Launches Non-Fluorinated PPE Fabrics*, Firehouse (Feb. 17, 2021), https://www.firehouse.com/safety-health/ppe/turnout-gear/press-release/21210722/fire-dex-fire-dex-launches-nonfluorinated-ppe-fabrics.

[43] Ronnie Wendt, *Innovations in Turnout Gear*, Industrial Fire World (Mar. 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear.

162. In or around 2022, a group of students at UC Berkley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in turnout gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of fire fighter turnout gear.

## V. CLASS ALLEGATIONS

163. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of themselves, their members, and the following individuals (the "Class"):

> All entities in the United States who bought turnout gear that was manufactured, designed, or sold, in whole or in part, by any of the named Defendants during the Class Period.

164. Plaintiff reserves the right to expand, narrow, or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

165. Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a

controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

166. **Ascertainability.** The proposed Class is readily ascertainable because it is defined using objective criteria, so as to allow class members to determine if they are part of the Class. Further, the members of the class can be readily identified through records and information in Defendants' possession, custody, or control.

167. **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. While the exact number of members of the Class is not known to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believe that there are thousands of class members.

168. **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including the following:

a. Whether Defendants violated RICO;

b. Whether Defendants engaged in the conduct alleged herein;

c. Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed PFAS products into the stream of commerce in the United States;

d. Whether Defendants knew about the dangers of PFAS and, if so, how long they have known;

e. Whether Defendants are liable under RICO;

f. Whether there is an enterprise within the meaning of RICO;

g. Whether Defendants participated in the enterprise;

h. Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount;

i. Whether Defendants breached their duty to warn the members of the Class of, and protect the members of the Class from, the long- term health risks and consequences of exposure to high levels of PFAS; and

j. Whether Defendants violated applicable state laws.

169. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff, and members of the Class sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiff, and each member of the Class were directly caused by

Defendants' wrongful conduct, and Plaintiff and members of the Class assert similar claims for relief.

170. **Adequacy.** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiff. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel has any interest adverse to those of the other members of the Class.

171. **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action is manageable. Plaintiff knows of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

## VI. TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF LIMITATIONS DISCOVERY RULE TOLLING

172. Defendants had knowledge of the hazard to the health and safety of Plaintiff, and Class members caused by exposure to PFAS Chemicals for decades.

173. Beginning in the 1960s and continuing through to the 1990s, Defendants conducted internal studies that demonstrated the toxicity of PFAS Chemicals.

174. Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiff, and Class members by designing, manufacturing, and selling turnout gear that was infused with PFAS.

175. Defendants intentionally concealed this information from Plaintiff, Class members, and the public.

176. Defendants intentionally and continuously misrepresented the safety of the turnout gear, PFAS-contaminated materials, and/or PFAS therein, assuring firefighters, the government, and the public that the turnout gear, PFAS-contaminated materials, and PFAS were safe.

177. At all relevant times, Plaintiff, and the Class members did not know or have reason to know of the Defendants' conduct that caused PFAS contamination.

178. Neither Plaintiff, nor any other Class members, through the exercise of reasonable care, could have discovered the conduct by Defendants alleged herein. Further, Plaintiff and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

179. For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff and the Class members.

## VII. FRAUDULENT CONCEALMENT TOLLING

180. Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiff, and Class members for decades.

181. Because of Defendants' active and ongoing concealment of the hazards of PFAS Chemicals, and the unique dangers posed to fire fighters through dermal absorption, ingestion, and inhalation of PFAS Chemicals through off-gassing and migration, Plaintiff could not have reasonably discovered the causes of action alleged herein.

182. For this reason, applicable limitations of actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiff or Class members should be tolled.

## VIII. CLAIMS ON BEHALF OF PLAINTIFF AND ALL CLASS MEMBERS

### COUNT I (against all Defendants)
### Violations of Racketeer Influenced and Corrupt Organizations Act (RICO)
### 18 U.S.C. § 1962(c), (d)

183. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

184. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

185. All Defendants are "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

186. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

187. For many years, each of the Defendants created and/or participated in the affairs of an illegal enterprise (the "PFAS Concealment Enterprise") whose purpose was to conceal the dangers of their PFAS products, including PFAS-infused products sold to turnout gear manufacturers. As set forth below, the acts of Defendants in furtherance of the PFAS Concealment Enterprise violate Section 1962(c) and (d).

**1. The members of the PFAS Concealment Enterprise.**

188. The PFAS Concealment Enterprise members are all defendants.

189. Concealment of the dangers of PFAS benefitted the enterprise in several ways. First, many of the Defendants, including 3M, Chemours, DuPont, and Gore, make other products infused with PFAS. To disclose the dangers of

PFAS in turnout gear would have called into question the safety of other products they manufactured. Second, DuPont, Gore, and Chemours were facing increasing and substantial potential liability for environmental damage caused by the manufacture of PFAS in the United States and other countries. Defendants were thus unwilling to state the truth about the dangers of PFAS in turnout gear so as to avoid fueling the fire about their products. Third, if Defendants had disclosed the dangers caused by PFAS in turnout gear, other firms would have competed far earlier to develop PFAS free turnout gear.

190. 3M had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

a. Manufacturing, distributing, and selling turnout gear to fire departments and others;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiff, members of the Class, and the public generally;

c. Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

e. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

191. Old DuPont and Chemours had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

a. Manufacturing, distributing, and selling turnout gear to fire departments;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to fire departments, Plaintiff, members of the Class, and the public generally;

c. Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused products;

d. Persisting in the manufacturing and/or distribution of PFAS products despite knowing about their dangers; and

e. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in turnout gear.

192. Lion Group, Inc. had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

a. Manufacturing, distributing, and selling turnout gear to fire departments and others;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiff, members of the Class, and the public generally;

c. Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

e. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

193. Globe Manufacturing Company, LLC had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

a. Manufacturing, distributing, and selling turnout gear to fire departments and others;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiff, members of the Class, and the public generally;

c. Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

e. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

194. Gore and Associates, Inc. had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

a. Manufacturing, distributing, and selling turnout gear to fire departments and others;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiff, members of the Class, and the public generally;

c. Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

e. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

195. All members of the PFAS Concealment Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present because such information lies in Defendants' and others' hands.

196. All members of the PFAS Concealment Enterprise served the common purpose of concealing the emissions dangers of PFAS-infused products from turnout gear manufacturers, Plaintiff, members of the Class, and the public

generally. Each member of the PFAS Concealment Enterprise shared the bounty generated by the PFAS Concealment Enterprise—*i.e.*, by continuing to sell PFAS-infused products for decades even though they knew that PFAS in those products posed grave dangers.

197. Concealment of the dangers of PFAS benefitted the enterprise in several ways. First, many of the Defendants, including 3M, Chemours, DuPont, and Gore, make other products infused with PFAS. To disclose the dangers of PFAS in turnout gear would have called into question the safety of other products they manufactured. Second, DuPont, Gore, and Chemours were facing potential liability for environmental damage caused by the manufacture of PFAS. Defendants were thus unwilling to state the truth about the dangers of PFAS. Third, if Defendants had disclosed the truth about the dangers caused by PFAS in turnout gear, other firms would have competed far earlier to develop turnout gear.

198. So, for example, Gore manufactures Gore-Tex Fabric[44] and spends considerable marketing resources to position itself as an exemplary environmental steward while also promising that its products represent a sound choice for the environmentally conscious consumer if fabric used in many brands of rain gear has forms of PFAS. More specifically, Gore relies on an umbrella public relations

---

[44] Gore-Tex Fabric means material produced by Gore and consisting of an ePTFE (expanded polytetrafluoroethylene) based Gore-Tex membrane and/or a durable water treatment (“DWR”) that contains PFAS (per- and polyfluoroalkyl substances).

campaign with "Responsible Performance" and "Committed to Sustainability" and "Environmentally Sound" themes to consistently disseminate environmental stewardship claims.

199. Gore promotes its products via its distinctive "Hang Tags" that are affixed to all products that are made with Gore-Tex Fabric. The Hang Tags are prominently attached to all Gore-Tex Fabric products at point of sale and must be removed prior to use:









200. Disclosing the danger in PFAS in turnout gear would potentially call into question the validity of these claims.

201. Likewise, 3M makes dozens of products that have PFAS and faced billions of dollars in potential liabilities. As noted in its 2024 SEC Form 10-K, its PFAS liability is substantial and was for years a liability 3M sought to concede:

> The Company has been voluntarily cooperating with various local, state, federal (primarily the U.S. Environmental Protection Agency (EPA)), and international agencies in their reviews of the environmental and health effects of certain PFAS produced by the Company. 3M currently is defending lawsuits concerning various PFAS-related products and chemistries, and is subject to unasserted and asserted claims and governmental regulatory proceedings and inquiries related to the production and use of PFAS in a variety of jurisdictions, as discussed in Note 19, "Commitments and Contingencies," within the Notes to Consolidated Financial Statements. 3M has seen increased public and private lawsuits being filed on behalf of states, counties, cities, and utilities alleging, among other things, harm to the general public and damages to natural resources, some of which are pending in the AFFF multi-district litigation and some of which are pending in other jurisdictions. Various factors or developments in these and other disclosed actions could result in future charges that could have a material adverse effect on 3M. For example, the Company recorded a pre-tax charge of $897 million, inclusive of legal fees and other related obligations, in the first quarter of 2018 with respect to the settlement of a matter brought by the State of Minnesota involving the presence of PFAS in the groundwater, surface water, fish or other aquatic life, and sediments in the state. In addition, as described in greater detail in Note 19, "Commitments and Contingencies," within the Notes to Consolidated Financial Statements, in June 2023, the Company entered into a class-action settlement ("PWS Settlement") to resolve a wide range of drinking water claims by public water suppliers in the United States regarding PFAS. The court approved that settlement in March 2024. 3M will pay $10.5 billion to $12.5 billion in total to resolve the claims released by the PWS Settlement, with payments to be made from 2024

> through 2036, in exchange for a release of certain claims, as described further in Note 19. Unexpected events related to the PWS Settlement, including the potential impact of the PWS Settlement on other PFAS-related matters, could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position. In addition, as previously disclosed, in connection with the separation of Solventum, the Company agreed to retain liabilities related to PFAS for certain products sold by the Company's health care businesses prior to the separation and by Solventum for a limited period of time following the separation.
>
> Governmental inquiries, lawsuits, or laws and regulations involving PFAS could lead to the Company incurring liability for damages or other costs, civil or criminal proceedings, the imposition of fines and penalties, or other remedies, including orders to conduct remediation, as well as restrictions on or added costs for business operations going forward, including in the form of restrictions on discharges at manufacturing facilities, requiring the installation of control technologies, suspension or shutdown of facility operations, switching costs in seeking alternative sources of supply, potential customer damage claims due to supply disruptions or otherwise, restoration of and/or compensation for damages to natural resources, personal injury and property damages, and reporting requirements or bans on PFAS and PFAS-containing products manufactured by the Company. The Company may also record asset retirement obligations, some of which may be material, depending in part on how the Company manages related assets in connection with these activities. Any of the foregoing could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position.

202. Likewise, Globe in its parent company's 10-K is also facing substantial liabilities that it fought for years to concede:

> Globe, a subsidiary of the Company, is defending claims in which plaintiffs assert that certain products allegedly containing per- and polyfluoroalkyl substances ("PFAS") have caused harm, including injury or health issues. PFAS are a large class of substances that are widely used in everyday products. Specifically, Globe builds firefighter turnout gear from technical fabrics sourced from a small

> pool of specialty textile manufacturers. These protective fabrics have been tested and certified to meet current National Fire Protection Association safety standards, and some of them as supplied to Globe contain or historically have contained PFAS to achieve performance characteristics such as water, oil, or chemical resistance.
>
> Globe believes it has valid defenses to these claims. These matters are at a very early stage with numerous factual and legal issues to be resolved. Defense costs relating to these lawsuits are recognized in the Consolidated Statements of Income as incurred. Globe is also pursuing insurance coverage and indemnification related to the lawsuits. As of February 4, 2025, Globe was named as a defendant in approximately 663 lawsuits comprised of about 8,801 claims, predominantly styled as individual personal injury claims and including two putative class actions. Certain of these lawsuits include MSA Safety Inc. or other Globe affiliates as defendants.
>
> MSA LLC is also a defendant in a number of PFAS lawsuits predominantly relating to Aqueous Film-Forming Foam. The Purchaser assumed responsibility for these and any similar future claims specific to MSA LLC, including such claims that have been or may be brought against MSA Safety Inc. or its subsidiaries, under the terms of the Purchase Agreement governing the Company's January 5, 2023, divestiture of MSA LLC. Further information about the transaction can be found in the Company's Current Report on Form 8-K filed on January 6, 2023

**2. The Predicate Acts**

203. To carry out or attempt to carry out the scheme to defraud, the members of the PFAS Concealment Enterprise conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

204. Specifically, the members of the PFAS Concealment Enterprise participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

205. The PFAS Concealment Enterprise members' use of the mails and wires include but are not limited to the transmission, delivery, or shipment of the following by the members or third parties that were foreseeably caused to be sent as a result of the PFAS Concealment Enterprise members' illegal scheme:

a. PFAS products to fire departments and others;

b. Documents and communications accompanying the shipments of PFAS products to fire departments and others;

c. False or misleading Material Safety Data Sheets, Safety Data Sheets, Technical Data Sheets, and product labels;

d. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of turnout gear products;

e. Documents intended to facilitate the manufacture and sale of PFAS-infused products, including invoices, shipping records, reports and correspondence;

f. Documents to process and receive payment for PFAS-infused turnout products, including invoices and receipts;

g. Payments to the PFAS Concealment Enterprise members for PFAS-infused turnout gear;

h. Deposits of proceeds from sales of PFAS-infused turnout gear by PFAS Concealment Enterprise members; and

i. Other documents and things, including electronic communications.

206. The PFAS Concealment Enterprise members utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

207. The PFAS Concealment Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

208. The mail and wire transmissions described herein were made in furtherance of the PFAS Concealment Enterprise members' scheme and common course of conduct to deceive regulators and consumers and lure turnout gear manufacturers into purchasing products that the PFAS Concealment Enterprise members knew emit PFAS.

209. Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the PFAS Concealment Enterprise members' books and records. But Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

210. The PFAS Concealment Enterprise members have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the PFAS Concealment Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the PFAS Concealment Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the PFAS Concealment Enterprise members and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

211. The PFAS Concealment Enterprise members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

212. To achieve their common goals, the PFAS Concealment Enterprise members hid from the general public, fire departments, and others the emission dangers of PFAS.

213. The PFAS Concealment Enterprise members, with knowledge and intent, have agreed to the overall objectives of the PFAS Concealment Enterprise and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling PFAS-infused products to turnout gear manufacturers.

214. The PFAS Concealment Enterprise members' conduct in furtherance of this scheme was intentional. Plaintiff and the Class members were harmed as a result of the PFAS Concealment Enterprise members' intentional conduct. Plaintiff, the Class members, regulators, and consumers, among others, relied on the PFAS Concealment Enterprise members material misrepresentations and omissions.

215. As described herein, the PFAS Concealment Enterprise members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and other Class members and obtaining

significant monies and revenues from them and through them while providing PFAS-infused products to turnout gear manufacturers and others. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

216. The predicate acts all had the purpose of generating significant revenue and profits for the PFAS Concealment Enterprise members at the expense of Plaintiff, the Class members, and consumers. The predicate acts were committed or caused to be committed by the PFAS Concealment Enterprise members through their participation in the PFAS Concealment Enterprise and in furtherance of its fraudulent scheme.

217. The PFAS Concealment Enterprise members had a duty to disclose the truth about the emissions dangers of PFAS-infused products to turnout gear manufacturers, consumers, and others but never do so. The Hazard Communication Standard requires that the chemical manufacturer, distributor, or importer provide Safety Data Sheets (SDSs) (formerly Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards.[45] The information contained in the SDS is largely the same as the Material

[45] The Standard was first adopted in 1983 in the United States with limited scope (48 FR 53280; November 25, 1983). In 1987, it was expanded to cover all industries where employees are potentially exposed to hazardous chemicals (52 FR 31852; August 24, 1987).

Safety Data Sheets, except now the SDSs are required to be presented in a consistent user-friendly, 16-section format.[46]

218. On information and belief, Plaintiff alleges that the PFAS Concealment Enterprise members never disclosed the emissions dangers of PFAS in PFAS-infused products in SDSs and Material Safety Data Sheets for PFAS-infused products that they sold to turnout gear manufacturers and others.

219. The PFAS Concealment Enterprise members' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and Class members, all of whom are entitled to bring this action for three times their actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each member of the PFAS Concealment Enterprise knew, understood, and intended for fire departments to purchase PFAS-infused turnout gear sold to Plaintiff and Class members, knowing that the PFAS emitted by turnout gear would injure Plaintiff and Class members. As a result of the conduct of the Enterprise, Plaintiff and Class members overpaid for turnout gear and/or were deprived of the ability to buy PFAS-free turnout gear.

//

//

//

[46] https://www.osha.gov/sites/default/files/publications/OSHA3514.pdf.

## B. State Law Claims

### 1. Claim brought on behalf of all Class members relating to their State-law claims for a single state law class in each state.

**COUNT II**
**Conspiracy**

220. **Under the common law of each State for which claims are alleged** below, Plaintiff alleges on information and belief that Defendants knowingly and intentionally conspired to engage in the wrongful conduct alleged in each Count under State law set forth below.

## A. State Law Claims

### 1. Claim brought on behalf of all Class members relating to their State-law claims for a single state law class in each state.

**COUNT III**
**Conspiracy**

221. Under the common law of each State for which claims are alleged below, Plaintiff alleges on information and belief that Defendants knowingly and intentionally conspired to engage in the wrongful conduct alleged in each Count under State law set forth below.

//

//

//

//

//

### 2. Claims brought by the Montana class for purchase of turnout gear in Montana.

**COUNT IV**
**Strict Liability**
**(design defect)**

222. Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs of this Complaint.

223. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

224. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Montana Class members, who might be foreseeably harmed by PFAS-infused products.

225. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

A. PFAS contamination causes extensive and persistent contamination of the environment even when use in their foreseeable and intended manner.

B. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

C. Defendants failed to disclose these threats to fire departments, Montana Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

226. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Montana Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

227. At all relevant times, Montana Class members used turnout gear infused with PFAS as intended.

228. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

229. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

230. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

231. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Montana Class members have been injured.

232. These and other acts by Defendants were a direct and proximate cause of damages to Montana Class members.

**COUNT V**
**Strict Products Liability**
**(Failure to Warn)**

233. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

234. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Montana Class

members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Montana Class members.

235. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Montana Class members of those risks.

236. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

237. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

238. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

239. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Montana Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Montana Class members used their turnout gear with PFAS-infused products as intended.

240. These and other acts by Defendants were a direct and proximate cause of damages to Montana Class members.

**COUNT VI**
**Implied Warranty of Merchantability**
**Mont. Code Ann. § 30-2-314**
**For Plaintiff and the Montana Class**

241. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

242. Plaintiff brings this claim individually and on behalf of the other members of the Montana Class.

243. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

244. Pursuant to Mont. Code § 30-2-314, a warranty that the PFAS-infused products were in merchantable condition was implied by law, and the PFAS-infused products were bought and sold subject to an implied warranty of merchantability.

245. Defendants were provided notice of these issues and defects.

246. The PFAS-infused products did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which they were used.

247. Defendants were provided notice of these issues and defects.

248. Plaintiffs and other Class members suffered injuries due to the defective nature of the PFAS-infused products and the Defendants' breach of the warranty of merchantability.

249. As a direct and proximate result of the Defendants' breach of the warranty of merchantability, Plaintiff and other Class members have been damaged in an amount to be proven at trial.

**COUNT VII**
**VIOLATIONS OF MONTANA CONSUMER PROTECTION ACT**
**Mont. Code Ann §§ 30-14-101 et seq.**
**Brought on Behalf of the Montana Class**

250. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

251. The Montana Consumer Protection Act (Montana CPA) prohibits "Unfair methods of competition and unfair and or deceptive acts or practices in the conduct of any trade or commerce…." Mont. Code Ann. § 30-14-103.

252. Defendants, Plaintiff, and the Montana Class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102 (6).

253. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Mont. Code. Ann. § 30-14-102 (8)(a).

254. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by

the Montana Class members were treated with PFAS-infused products, with the intent that other rely upon the concealment, suppression, or omission.

255. In purchasing their turnout gear, the Montana Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

256. The Montana Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

257. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

258. Defendants knew or should have known that their conduct violated the Montana CPA.

259. Defendants owed the Montana Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that the PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Montana Class members; and

b. Intentionally concealed the foregoing from the Montana Class members.

260. Defendants' conduct proximately caused injuries to the Montana Class members.

261. The Montana Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

262. Defendants' violations present a continuing risk to the Montana Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

263. The Montana Class members seek damages in amounts to be proven at trial, along with attorney's fees, costs, and punitive damages, and any other just and proper relief under Mont. Code Ann. § 30-14-102(8)(a).

**3. Claims brought on behalf of Class members who installed their turnout gear in Alabama (the "Alabama Class members").**

**COUNT VIII (against all Defendants)**
**Alabama Extended Manufacturer's Liability Doctrine**
**(design defect)**

264. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

265. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

266. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Alabama Class members, who might be foreseeably harmed by PFAS-infused products.

267. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment and to those who wear turnout gear.

c. Defendants failed to disclose these threats to fire departments, Alabama Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

268. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Alabama Class members, to an extent

beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

269. At all relevant times, Alabama Class members used turnout gear infused with PFAS as intended.

270. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

271. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

272. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

273. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Alabama Class members have been injured.

274. These and other acts by Defendants were a direct and proximate cause of damages to Alabama Class members.

**COUNT IX (against all Defendants)**
**Alabama Extended Manufacturer's Liability Doctrine**
**(failure to warn)**

275. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

276. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Alabama Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Alabama Class members.

277. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Alabama Class members of those risks.

278. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

279. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

280. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

281. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Alabama Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Alabama Class members used turnout gear infused with PFAS as intended.

282. These and other acts by Defendants were a direct and proximate cause of damages to Alabama Class members.

//

//

//

//

//

### 4. Claims brought on behalf of Class members who installed their turnout gear in Alaska (the "Alaska Class members").

### COUNT X (against all Defendants)
### Strict Products Liability
### (design defect)

283. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

284. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

285. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Alaska Class members, who might be foreseeably harmed by PFAS-infused products.

286. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment and to those who wear turnout gear.

c. Defendants failed to disclose these threats to fire departments, Alaska Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

287. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to Alaska Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

288. At all relevant times, Alaska Class members used turnout gear infused with PFAS as intended.

289. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

290. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

291. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

292. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Alaska Class members have been injured.

293. These and other acts by Defendants were a direct and proximate cause of damages to Alaska Class members.

**COUNT XI (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

294. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

295. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Alaska Class members.

296. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Alaska Class members of those risks.

297. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

298. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

299. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

300. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Alaska Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Alaska Class members used their turnout gear with PFAS-infused products as intended.

301. These and other acts by Defendants were a direct and proximate cause of damages to Alaska Class members.

## COUNT XII (against all Defendants)
## Violation of the Alaska Unfair Trade Practices and Consumer Protection Act
## (ALASKA STAT. ANN. § 45.50.471 *et seq.)*

302. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

303. The Alaska Unfair Trade Practices and Consumer Protection Act (Alaska CPA) declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged." ALASKA STAT. ANN. § 45.50.471(b)(12).

304. The Alaska Class members are "consumers" within the meaning of ALASKA STAT. ANN. § 45.50.561(4).

305. Defendants were engaged "in the conduct of trade or commerce" within the meaning of ALASKA STAT. ANN. § 45.50.471(a) when they sold their PFAS-infused products to turnout gear manufacturers.

306. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by

the Alaska Class members was treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

307. In purchasing their turnout gear, the 669 Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

308. The Alaska Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

309. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

310. Defendants knew or should have known that their conduct violated the Alaska CPA.

311. Defendants owed the Alaska Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their products were infused with PFAS and were applied to turnout gear purchased by the Alaska Class members; and

b. Intentionally concealed the foregoing from the Alaska Class members.

312. Defendants' conduct proximately caused injuries to the Alaska Class members.

313. The Alaska Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

314. Defendants' violations present a continuing risk to the Alaska Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

315. Pursuant to ALASKA STAT. ANN. § 45.50.531(a), Alaska Class members seek "to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater."

316. The Alaska Class members also seek attorneys' fees and any other just and proper relief available under the Alaska CPA.

317. On April 1, 2025, Plaintiff sent a letter to Defendants complying with ALASKA STAT. ANN. § 45.50.535(b)(1).

//

//

//

//

**5. Claims brought on behalf of Class members who installed their turnout gear in Arizona (the "Arizona Class members").**

**COUNT XIII (against all Defendants)**
**Strict Products Liability**
**(design defect)**

318. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

319. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

320. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Arizona Class members, who might be foreseeably harmed by PFAS-infused products.

321. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment and to those who wear turnout gear.

c. Defendants failed to disclose these threats to fire departments, Arizona Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

322. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Arizona Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

323. At all relevant times, the Arizona Class members used turnout gear infused with PFAS as intended.

324. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

325. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

326. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

327. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Arizona Class members have been injured.

328. These and other acts by Defendants were a direct and proximate cause of damages to Arizona Class members.

**COUNT XIV (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

329. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

330. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Arizona Class

members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Arizona Class members.

331. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Arizona Class members of those risks.

332. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

333. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

334. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

335. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Arizona Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Arizona Class members used their turnout gear with PFAS-infused products as intended.

336. These and other acts by Defendants were a direct and proximate cause of damages to Arizona Class members.

**COUNT XV (against all Defendants)**
**Violation of the Arizona Consumer Fraud Act**
**(ARIZ. REV. STAT. § 44-1521 *et seq.*)**

337. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

338. The Arizona Consumer Fraud Act (Arizona CFA) provides that the "act, use or employment by any person of any deception, deceptive act or practice, fraud … , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

339. Each Defendant and each Arizona Class member is a "person" within the meaning of the Arizona CFA, ARIZ. REV. STAT. § 44-1521(6).

340. PFAS-infused products are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

341. Defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

342. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Arizona Class members was treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

343. In purchasing their turnout gear, the Arizona Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

344. The Arizona Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

345. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

346. Defendants knew or should have known that their conduct violated the Arizona CFA.

347. Defendants owed the Arizona Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Arizona Class members; and

b. Intentionally concealed the foregoing from the Arizona Class members.

348. Defendants' conduct proximately caused injuries to the Arizona Class members.

349. The Arizona Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

350. Defendants' violations present a continuing risk to the Arizona Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

351. Pursuant to the Arizona CFA, Plaintiff seeks monetary relief against each Defendant in an amount to be determined at trial. Plaintiff also seeks punitive damages because each Defendant engaged in aggravated and outrageous conduct with an evil mind.

//

//

//

//

//

**6. Claims brought on behalf of Class members who installed their turnout gear in Arkansas ("Arkansas Class members").**

**COUNT XVI (against all Defendants)**
**Strict Products Liability**
**(design defect)**

352. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

353. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

354. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Arkansas Class members, who might be foreseeably harmed by PFAS-infused products.

355. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment and to those who wear turnout gear.

c. Defendants failed to disclose these threats to fire departments, Arkansas Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

356. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Arkansas Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

357. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

358. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

359. At all relevant times, Arkansas Class members used turnout gear infused with PFAS as intended.

360. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

361. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Arkansas Class members have been injured.

362. These and other acts by Defendants were a direct and proximate cause of damages to the Arkansas Class members.

**COUNT XVII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

363. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

364. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Arkansas Class

members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Arkansas Class members.

365. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Arkansas Class members of those risks.

366. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

367. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

368. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

369. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Arkansas Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Arkansas Class members used their turnout gear with PFAS-infused products as intended.

370. These and other acts by Defendants were a direct and proximate cause of damages to the Arkansas Class members.

**7. Claims brought on behalf of Class members who installed their turnout gear in California ("California Class members").**

**COUNT XVIII (against all Defendants)**
**Violation of the California Unfair Competition Law**
**(CAL. BUS. & PROF. CODE § 17200 *et seq.*)**

371. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

372. California's Unfair Competition Law (UCL), CAL. BUS. & PROF. CODE § 17200 *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

373. The California Class members and Defendants are "persons" within the meaning of CAL. BUS. & PROF. CODE § 17201.

374. In purchasing their turnout gear, the California Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

375. The California Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

376. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

377. Defendants knew or should have known that their conduct violated the UCL.

378. Defendants owed the California Class a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the California Class members; and

b. Intentionally concealed the foregoing from the California Class members.

379. Defendants' conduct proximately caused injuries to the California Class members.

380. The California Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

381. Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

382. Plaintiff requests that this Court enter such orders or judgments as may be necessary to restore to the California Class members any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief as may be appropriate.

**8. Claims brought on behalf of Class members who installed their turnout gear in Colorado ("Colorado Class members").**

**COUNT XIX (against all Defendants)**
**Strict Products Liability**
**(design defect)**

383. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

384. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

385. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Colorado Class members, who might be foreseeably harmed by PFAS-infused products.

386. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Colorado Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

387. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Colorado Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

388. At all relevant times, the Colorado Class members used turnout gear infused with PFAS as intended.

389. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by

PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

390. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

391. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

392. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Colorado Class members have been injured.

393. These and other acts by Defendants were a direct and proximate cause of damages to the Colorado Class members.

**COUNT XX (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

394. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

395. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Colorado Class members, as well as to all turnout gear, manufacturers who treated their turnout gear, with PFAS-infused products before selling them to Colorado Class members.

396. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Colorado Class members of those risks.

397. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

398. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

399. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

400. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Colorado Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Colorado Class members used their turnout gear, with PFAS-infused products as intended.

401. These and other acts by Defendants were a direct and proximate cause of damages to the Colorado Class members.

**COUNT XXI (against all Defendants)**
**Violation of the Colorado Consumer Protection Act**
**(COLO. REV. STAT. § 6-1-101 *et seq.*)**

402. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

403. The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive practices in the course of a person's business, including but not limited to "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105.

404. Plaintiff, Colorado Class members, and Defendants are "persons" within the meaning of under COLO. REV. STAT. § 6-1-102(6).

405. The Colorado Class members are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a).

406. Each Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

407. In purchasing their turnout gear, the Colorado Class members were deceived by Defendants' failure to disclose the material information that their turnout gear was treated with PFAS-infused products.

408. The Colorado Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

409. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

410. Defendants knew or should have known that their conduct violated the Colorado CPA.

411. Defendants owed the Colorado Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Colorado Class members; and

b. Intentionally concealed the foregoing from the Colorado Class members.

412. Defendants' conduct proximately caused injuries to the Colorado Class members.

413. Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff seeks monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each plaintiff or class member.

414. Plaintiff also seeks attorneys' fees and any other just and proper remedy under the Colorado CPA.

**9. Claims brought on behalf of Class members who installed their turnout gear in Connecticut (collectively, "Connecticut Class members").**

**COUNT XXII (against all Defendants)**
**Strict Products Liability**
**(design defect)**

415. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

416. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

417. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the

Connecticut Class members, who might be foreseeably harmed by PFAS-infused products.

418. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Connecticut Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

419. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Connecticut Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

420. At all relevant times, Connecticut Class members used turnout gear infused with PFAS as intended.

421. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

422. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

423. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

424. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Connecticut Class members have been injured.

425. These and other acts by Defendants were a direct and proximate cause of damages to the Connecticut Class members.

**COUNT XXIII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

426. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

427. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Connecticut Class members, as well as to all turnout gear, manufacturers who treated their turnout gear, with PFAS-infused products before selling them to Connecticut Class members.

428. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Connecticut Class members of those risks.

429. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

430. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

431. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

432. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Connecticut Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Connecticut Class members used their turnout gear with PFAS-infused products as intended.

433. These and other acts by Defendants were a direct and proximate cause of damages to the Connecticut Class members.

### 10. Claims brought on behalf of Class members who installed their turnout gear in Delaware ("Delaware Class members").

### COUNT XXIV (against all Defendants)
### Negligence
### (design defect)

434. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

435. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

436. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to negligently place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Delaware Class members, who might be foreseeably harmed by PFAS-infused products.

437. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Delaware Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

438. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Delaware Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

439. At all relevant times, Delaware Class members used turnout gear infused with PFAS as intended.

440. Defendants knew of these risks and nevertheless negligently failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

441. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

442. Defendants' PFAS-infused products were defectively and negligently designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

443. As a direct and proximate result of Defendants' negligent design of unreasonably dangerous PFAS-infused products, Delaware Class members have been injured.

444. These and other acts by Defendants were a direct and proximate cause of damages to the Delaware Class members.

**COUNT XXV (against all Defendants)**
**Negligence**
**(failure to warn)**

445. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

446. As manufacturers or distributors of PFAS-infused products, Defendants had a duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew or should have known about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Delaware Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Delaware Class members.

447. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants negligently failed to warn turnout gear manufacturers, consumers, the public, and Delaware Class members of those risks.

448. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the

dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

449. Defendants' inadequate and negligent warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

450. Defendants' PFAS-infused products were defective by virtue of their negligently inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

451. Defendants' negligent failure to warn proximately caused reasonably foreseeable injuries to Delaware Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Delaware Class members used their turnout gear with PFAS-infused products as intended.

452. These and other acts by Defendants were a direct and proximate cause of damages to the Delaware Class members.

**COUNT XXVI (against all Defendants)**
**Violation of the Delaware Consumer Fraud Act**
**(Del. Code Tit. 6, § 2513 *et seq.*)**

453. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

454. The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." DEL. CODE TIT. 6, § 2513(a).

455. Plaintiff, Delaware Class members, and Defendants are "persons" within the meaning of DEL. CODE TIT. 6, § 2511(7).

456. Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

457. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Delaware Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

458. In purchasing their turnout gear, the Delaware Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

459. The Delaware Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

460. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

461. Defendants knew or should have known that their conduct violated the Delaware CFA.

462. Defendants owed the Delaware Class a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Delaware Class members; and

b. Intentionally concealed the foregoing from the Delaware Class members.

463. Defendants' conduct proximately caused injuries to the Delaware Class members.

464. The Delaware Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

465. Defendants' violations present a continuing risk to the Delaware Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

466. Plaintiff seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980). Plaintiff also seeks attorneys' fees and any other just and proper relief available under the Delaware CFA.

467. Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

### 11. Claims brought on behalf of Class members who installed their turnout gear in Georgia ("Georgia Class members").

**COUNT XXVII (against all Defendants)**
**Violation of the Georgia Fair Business Practices Act**
**(GA. CODE ANN. § 10-1-390 *et seq.*)**

468. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

469. The Georgia Fair Business Practices Act (Georgia FBPA) declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 101-393(b).

470. The Georgia Class members are "consumers" within the meaning of GA. CODE. ANN. § 10-1-392(a)(6).

471. Each Defendant engaged in "trade or commerce" within the meaning of GA. CODE. ANN. § 10-1-393(a)(28).

472. In purchasing their turnout gear, the Georgia Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

473. The Georgia Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

474. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

475. Defendants knew or should have known that their conduct violated the Georgia FBPA.

476. Defendants owed the Georgia Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Georgia Class members; and

b. Intentionally concealed the foregoing from the Georgia Class members.

477. Defendants' conduct proximately caused injuries to the Georgia Class members.

478. The Georgia Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

479. Defendants' violations present a continuing risk to the Georgia Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

480. Plaintiff and the Georgia Class members are entitled to recover damages and exemplary damages (for intentional violations) pursuant to GA. CODE ANN. § 10-1-399(a). Plaintiff also seeks attorneys' fees and any other just and proper relief available under the Georgia FBPA pursuant to GA. CODE ANN. § 10-1-399.

481. On April 1, 2025, Plaintiff sent a letter to Defendants complying with GA. CODE ANN. § 10-1-399(b).

**COUNT XXVIII (against all Defendants)**
**Violation of the Georgia Uniform Deceptive Trade Practices Act**
**(GA. CODE ANN. § 10-1-370 *et seq.*)**

482. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

483. Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices." GA. CODE ANN. § 10-1-372(a).

484. Defendants, Plaintiff, and Georgia Class members are "persons" within the meaning of GA. CODE ANN. § 10-1-371(5).

485. Defendants engaged in deceptive conduct, as alleged above for their violations of the Georgia FBPA.

486. The Georgia Class members seek attorneys' fees and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

**12. Claims brought on behalf of Class members who installed their turnout gear in Hawaii ("Hawaii Class members").**

**COUNT XXIX (against all Defendants)**
**Strict Products Liability**
**(design defect)**

487. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

488. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

489. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Hawaii Class members, who might be foreseeably harmed by PFAS-infused products.

490. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Hawaii Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

491. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Hawaii Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

492. At all relevant times, Hawaii Class members used turnout gear infused with PFAS as intended.

493. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

494. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

495. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

496. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Hawaii Class members have been injured.

497. These and other acts by Defendants were a direct and proximate cause of damages to Hawaii Class members.

**COUNT XXX (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

498. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

499. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Hawaii Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Hawaii Class members.

500. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Hawaii Class members of those risks.

501. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

502. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

503. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

504. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Hawaii Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Hawaii Class members used their turnout gear with PFAS-infused products as intended.

505. These and other acts by Defendants were a direct and proximate cause of damages to the Hawaii Class members.

**13. Claims brought on behalf of Class members who installed their turnout gear in Illinois ("Illinois Class members").**

**COUNT XXXI (against all Defendants)**
**Strict Products Liability**
**(design defect)**

506. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

507. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

508. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Illinois Class members, who might be foreseeably harmed by PFAS-infused products.

509. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Illinois Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

510. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Illinois Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

511. At all relevant times, the Illinois Class members used turnout gear infused with PFAS as intended.

512. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

513. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

514. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

515. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Illinois Class members have been injured.

516. These and other acts by Defendants were a direct and proximate cause of damages to the Illinois Class members.

**COUNT XXXII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

517. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

518. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Illinois Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Illinois Class members.

519. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Illinois Class members of those risks.

520. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

521. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

522. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

523. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Illinois Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Illinois Class members used their turnout gear with PFAS-infused products as intended.

524. These and other acts by Defendants were a direct and proximate cause of damages to Illinois Class members.

**COUNT XXXIII (against all Defendants)**
**Violation of Illinois Consumer Fraud and**
**Deceptive Business Practices Act**
**(815 Ill. Comp. Stat. Ann. 505/1 *et seq.*)**

525. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

526. The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) declares several specific actions to be unlawful, including "any deception, fraud, false pretense, false promise, misrepresentation or the concealment,

suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

527. The Illinois Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

528. Defendants were engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) when they sold their PFAS-infused products to turnout gear manufacturers.

529. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Illinois Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

530. In purchasing their turnout gear, the Illinois Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

531. The Illinois Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

532. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

533. Defendants knew or should have known that their conduct violated the ICFA.

534. Defendants owed the Illinois Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Illinois Class members; and

b. Intentionally concealed the foregoing from the Illinois Class members.

535. Defendants' conduct proximately caused injuries to the Illinois Class members.

536. The Illinois Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

537. Defendants' violations present a continuing risk to the Illinois Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

538. Pursuant to 815 ILCS 505/10a(a), the Illinois Class members seek monetary relief against Defendants measured as the greater of (a) actual damages

in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

539. The Illinois Class members seek attorneys' fees and any other just and proper relief available under 815 ILCS 505/10a(c).

### 14. Claims brought on behalf of Class members who installed their turnout gear in Indiana ("Indiana Class members").

### COUNT XXXIV (against all Defendants)
### Violation of Indiana Products Liability Act
### IND. CODE ANN. § 34-20-1-1 *et seq.*
### (design defect)

540. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

541. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

542. At all times relevant to this action, Defendants had a duty to ensure that the design of PFAS-infused products made them reasonably fit and safe for the purpose for which they were intended.

543. Defendants' PFAS-infused products were not reasonably safe as designed and have been unreasonably dangerous for their intended, foreseeable, and ordinary use and disposal.

544. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Indiana Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

545. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Indiana Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

546. At all relevant times, Indiana Class members used turnout gear infused with PFAS as intended.

547. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by

PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

548. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

549. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control. Defendants expected that their PFAS-infused products would reach consumers without a substantial change in their condition, and those products reached their end users without substantial change in their condition.

550. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Indiana Class members have been injured.

551. These and other acts by Defendants were a direct and proximate cause of damages to Indiana Class members.

**COUNT XXXV (against all Defendants)**
**Violation of Indiana Products Liability Act**
**IND. CODE ANN. § 34-20-1-1 *et seq.***
**(failure to warn)**

552. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint

553. Defendants had a duty to reasonably warn Indiana Class members of the dangers posed by their PFAS-infused products.

554. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including the Indiana Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to the Indiana Class members. Defendants, by exercising reasonable diligence, could have made such warnings available to those third parties. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants unreasonably failed to warn turnout gear manufacturers, consumers, the public, and Indiana Class members in particular of those risks.

555. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

556. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

557. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

558. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Indiana Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Indiana Class members used their turnout gear with PFAS-infused products as intended.

559. These and other acts by Defendants were a direct and proximate cause of damages to Indiana Class members.

### 15. Claims brought on behalf of Class members who installed their turnout gear in Iowa ("Iowa Class members").

### COUNT XXXVI (against all Defendants) Design Defect claim

560. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

561. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

562. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Iowa Class members, who might be foreseeably harmed by PFAS-infused products.

563. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Iowa Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

564. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Iowa Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

565. At all relevant times, Iowa Class members used turnout gear infused with PFAS as intended.

566. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

567. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

568. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

569. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Iowa Class members have been injured.

570. These and other acts by Defendants were a direct and proximate cause of damages to Iowa Class members.

**COUNT XXXVII (against all Defendants)**
**Failure to Warn Claim**

571. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

572. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Iowa Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Iowa Class members.

573. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Iowa Class members of those risks.

574. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

575. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

576. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

577. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Iowa Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Iowa Class members used their turnout gear with PFAS-infused products as intended.

578. These and other acts by Defendants were a direct and proximate cause of damages to Iowa Class members.

**COUNT XXXVIII (against all Defendants)**
**Violation of Iowa Private Right of Action for Consumer Frauds Act**
**(IOWA CODE § 714h.1 *et seq.*)**

579. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

580. The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense,

false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3.

581. Each Defendant and each Iowa Class member is a "person" under IOWA CODE § 714H.2(7).

582. The Iowa Class members are "consumers" as defined by IOWA CODE § 714H.2(3).

583. In purchasing their turnout gear, the Iowa Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

584. The Iowa Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

585. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

586. Defendants knew or should have known that their conduct violated the Iowa CFA.

587. Defendants owed the Iowa Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Iowa Class members; and

b. Intentionally concealed the foregoing from the Iowa Class members.

588. Defendants' conduct proximately caused injuries to the Iowa Class members.

589. The Iowa Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

590. Defendants' violations present a continuing risk to the Iowa Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

591. Pursuant to IOWA CODE § 714H.5, Plaintiff seeks actual damages, statutory damages up to three times the amount of actual damages awarded as a result of each Defendant's willful and wanton disregard for the rights of others, and attorneys' fees.

//

//

//

## 16. Claims brought on behalf of Class members who installed their turnout gear in Maryland ("Maryland Class members").

### COUNT XXXIX (against all Defendants)
### Strict Products Liability
### (design defect)

592. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

593. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

594. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Maryland Class members, who might be foreseeably harmed by PFAS-infused products.

595. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Maryland Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

596. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Maryland Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

597. At all relevant times, Maryland Class members used turnout gear infused with PFAS as intended.

598. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

599. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

600. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

601. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Maryland Class members have been injured.

602. These and other acts by Defendants were a direct and proximate cause of damages to Maryland Class members.

**COUNT XL (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

603. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

604. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Maryland Class

members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Maryland Class members.

605. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Maryland Class members of those risks.

606. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

607. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

608. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

609. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Maryland Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Maryland Class members used their turnout gear with PFAS-infused products as intended.

610. These and other acts by Defendants were a direct and proximate cause of damages to Maryland Class members.

**COUNT XLI (against all Defendants)**
**Violation of Maryland Consumer Protection Act**
**(MD. CODE ANN., COM. LAW § 13-101 *et seq.*)**

611. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

612. The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COM. LAW § 13-302.

613. Defendants, Plaintiff, and Maryland Class members are "persons" within the meaning of MD. CODE ANN., COM. LAW § 13-101(h).

614. In purchasing their turnout gear, the Maryland Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

615. The Maryland Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

616. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

617. Defendants knew or should have known that their conduct violated the Maryland CPA.

618. Defendants owed the Maryland Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Maryland Class members; and

b. Intentionally concealed the foregoing from the Maryland Class members.

619. Defendants' conduct proximately caused injuries to the Maryland Class members.

620. The Maryland Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

621. Defendants' violations present a continuing risk to the Maryland Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

622. Pursuant to MD. CODE ANN., COM. LAW § 13-408, Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**17. Claims brought on behalf of Class members who installed their turnout gear in Massachusetts ("Massachusetts Class members").**

**COUNT XLII (against all Defendants)**
**Breach of the implied warranty of merchantability**
**(design defect)**

623. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

624. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

625. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Massachusetts Class members, who might be foreseeably harmed by PFAS-infused products.

626. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Massachusetts Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

627. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Massachusetts Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

628. At all relevant times, Massachusetts Class members used turnout gear infused with PFAS as intended.

629. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this **complaint or could have designed their PFAS-infused products in ways that** substantially reduced or eliminated the health and environmental dangers posed by

PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

630. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

631. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

632. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Massachusetts Class members have been injured.

633. These and other acts by Defendants were a direct and proximate cause of damages to Massachusetts Class members.

**COUNT XLIII (against all Defendants)**
**Breach of the Implied Warranty of Merchantability**
**(failure to warn)**

634. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

635. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Massachusetts Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Massachusetts Class members.

636. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Massachusetts Class members of those risks.

637. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

638. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

639. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

640. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Massachusetts Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Massachusetts Class members used their turnout gear with PFAS-infused products as intended.

641. These and other acts by Defendants were a direct and proximate cause of damages to Massachusetts Class members.

**COUNT XLIV (against all Defendants)**
**Violation of the Massachusetts General Law Chapter 93A**
**(MASS. GEN. LAWS CH. 93A, § 1 *et seq.*)**

642. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

643. Plaintiffs have served a statutory demand letter and will amend to add a Section 93A claim in 30 days. This count is just a placeholder for now.

644. The Massachusetts Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

645. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

646. Defendants knew or should have known that their conduct violated the MCPA.

647. Defendants owed the Massachusetts Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Massachusetts Class members; and

b. Intentionally concealed the foregoing from the Massachusetts Class members.

648. Defendants' conduct proximately caused injuries to the Massachusetts Class members.

649. The Massachusetts Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

650. Defendants' violations present a continuing risk to the Massachusetts Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

651. The Massachusetts Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

652. Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Massachusetts Class members seek attorneys' fees, costs, and any other just and proper relief available under the MCPA.

653. On April 1, 2025, Plaintiff sent a letter to Defendants complying with MASS. GEN. LAWS CH. 93A, § 9(3).

### 18. Claims brought on behalf of Class members who installed their turnout gear in Minnesota ("Minnesota Class members").

### COUNT XLV (against all Defendants)
### Strict Products Liability
### (design defect)

654. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

655. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

656. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Minnesota Class members, who might be foreseeably harmed by PFAS-infused products.

657. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Minnesota Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

658. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Minnesota Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

659. At all relevant times, Minnesota Class members used turnout gear infused with PFAS as intended.

660. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by

PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

661. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

662. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

663. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Minnesota Class members have been injured.

664. These and other acts by Defendants were a direct and proximate cause of damages to Minnesota Class members.

**COUNT XLVI (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

665. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

666. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Minnesota Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Minnesota Class members.

667. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Minnesota Class members of those risks.

668. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

669. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

670. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

671. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Minnesota Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Minnesota Class members used their turnout gear with PFAS-infused products as intended.

672. These and other acts by Defendants were a direct and proximate cause of damages to Minnesota Class members.

**19. Claims brought on behalf of Class members who installed their turnout gear in Missouri ("Missouri Class members").**

**COUNT XLVII (against all Defendants)**
**Strict Products Liability**
**(design defect)**

673. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

674. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

675. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Missouri Class members, who might be foreseeably harmed by PFAS-infused products.

676. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Missouri Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

677. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Missouri Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

678. At all relevant times, Missouri Class members used turnout gear infused with PFAS as intended.

679. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this

complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

680. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

681. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

682. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Missouri Class members have been injured.

683. These and other acts by Defendants were a direct and proximate cause of damages to Missouri Class members.

**COUNT XLVIII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

684. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

685. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Missouri Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Missouri Class members.

686. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Missouri Class members of those risks.

687. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

688. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

689. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

690. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Missouri Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Missouri Class members used their turnout gear with PFAS-infused products as intended.

691. These and other acts by Defendants were a direct and proximate cause of damages to Missouri Class members.

**COUNT XLIX (against all Defendants)**
**Violation of the Missouri Merchandising Practices Act**
**(MO. REV. STAT. § 407.005 *et seq.*)**

692. Plaintiff's incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

693. The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020(1).

694. Defendants, Plaintiff, and Missouri Class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

695. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

696. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Missouri Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

697. In purchasing their turnout gear, the Missouri Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

698. The Missouri Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

699. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

700. Defendants knew or should have known that their conduct violated the Missouri MPA.

701. Defendants owed the Missouri Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Missouri Class members; and

b. Intentionally concealed the foregoing from the Missouri Class members.

702. Defendants' conduct proximately caused injuries to the Missouri Class members.

703. The Missouri Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

704. Defendants' violations present a continuing risk to the Missouri Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

705. The Missouri Class members seek damages in amounts to be proven at trial, along with attorneys' fees, costs, and punitive damages, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

//

//

//

**20. Claims brought on behalf of Class members who installed their turnout gear in Nevada ("Nevada Class members").**

**COUNT L (against all Defendants)**
**Strict Products Liability**
**(design defect)**

706. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

707. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

708. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Nevada Class members, who might be foreseeably harmed by PFAS-infused products.

709. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Nevada Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

710. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Nevada Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

711. At all relevant times, Nevada Class members used turnout gear infused with PFAS as intended.

712. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

713. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

714. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

715. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Nevada Class members have been injured.

716. These and other acts by Defendants were a direct and proximate cause of damages to Nevada Class members.

**COUNT LI (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

717. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

718. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Nevada Class

members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Nevada Class members.

719. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Nevada Class members of those risks.

720. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

721. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

722. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

723. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Nevada Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Nevada Class members used their turnout gear with PFAS-infused products as intended.

724. These and other acts by Defendants were a direct and proximate cause of damages to Nevada Class members.

**COUNT LII (against all Defendants)**
**Violation of the Nevada Deceptive Trade Practices Act**
**(NEV. REV. STAT. § 598.0903 *et seq.*)**

725. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

726. The Nevada Deceptive Trade Practices Act (Nevada DTPA) prohibits deceptive trade practices. NEV. REV. STAT. § 598.0923(1)(b) provides that a "person engages in a 'deceptive trade practice" when in the course of his or her business or occupation he or she knowingly … [f]ails to disclose a material fact in connection with the sale or lease of goods or services."

727. In purchasing their turnout gear, the Nevada Class members were deceived by Defendants' failure to disclose the material fact that their turnout gear was treated with PFAS-infused products.

728. The Nevada Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

729. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

730. Defendants knew or should have known that their conduct violated the Nevada DTPA.

731. Defendants owed the Nevada Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Nevada Class members; and

b. Intentionally concealed the foregoing from the Nevada Class members.

732. Defendants' conduct proximately caused injuries to the Nevada Class members.

733. The Nevada Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

734. Defendants' violations present a continuing risk to the Nevada Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

735. The Nevada Class members seek their actual damages, punitive damages, costs, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.

### 21. Claims brought on behalf of Class members who installed their turnout gear in New Hampshire ("New Hampshire Class members").

### COUNT LIII (against all Defendants)
### Strict Products Liability
### (design defect)

736. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

737. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

738. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New Hampshire Class members, who might be foreseeably harmed by PFAS-infused products.

739. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, New Hampshire Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

740. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the New Hampshire Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

741. At all relevant times, New Hampshire Class members used turnout gear infused with PFAS as intended.

742. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

743. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

744. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

745. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Hampshire Class members have been injured.

746. These and other acts by Defendants were a direct and proximate cause of damages to New Hampshire Class members.

**COUNT LIV (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

747. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

748. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably

harmed by the ordinary use and misuse of their products, including New Hampshire Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to New Hampshire Class members.

749. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and New Hampshire Class members of those risks.

750. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

751. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

752. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

753. Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Hampshire Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant

times, New Hampshire Class members used their turnout gear with PFAS-infused products as intended.

754. These and other acts by Defendants were a direct and proximate cause of damages to New Hampshire Class members.

**COUNT LV (against all Defendants)**
**Violation of the New Hampshire Consumer Protection Act**
**(N.H. REV. STAT. ANN. § 358-A:1 *et seq.*)**

755. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

756. The New Hampshire Consumer Protection Act (New Hampshire CPA) makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. REV. STAT. § 358-A:2.

757. Defendants, Plaintiff, and New Hampshire Class members are "persons" within the meaning of N.H. REV. STAT. ANN. § 358-A:1.

758. Defendants' actions as set forth herein occurred in the conduct of trade and commerce within the meaning of N.H. REV. STAT. ANN. § 358-A:1.

759. In purchasing their turnout gear, the New Hampshire Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

760. The New Hampshire Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

761. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

762. Defendants knew or should have known that their conduct violated the New Hampshire CPA.

763. Defendants owed New Hampshire Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the New Hampshire Class members; and

b. Intentionally concealed the foregoing from the New Hampshire Class members.

764. Defendants' conduct proximately caused injuries to the New Hampshire Class members.

765. The New Hampshire Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct, as a direct and natural consequence of Defendants' omissions.

766. Defendants' violations present a continuing risk to the New Hampshire Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

767. Because Defendants' willful conduct caused injury to Plaintiff's property through violations of the New Hampshire CPA, Plaintiff seeks recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

### 22. Claims brought on behalf of Class members who installed their turnout gear in New Jersey ("New Jersey Class members").

### COUNT LVI (against all Defendants)
### Strict Products Liability
### (design defect)

768. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

769. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

770. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New Jersey Class members, who might be foreseeably harmed by PFAS-infused products.

771. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, New Jersey Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

772. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the New Jersey Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

773. At all relevant times, New Jersey Class members used turnout gear infused with PFAS as intended.

774. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this

complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

775. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

776. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

777. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Jersey Class members have been injured.

778. These and other acts by Defendants were a direct and proximate cause of damages to New Jersey Class members.

//

//

//

**COUNT LVII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

779. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

780. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New Jersey Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to New Jersey Class members.

781. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and New Jersey Class members of those risks.

782. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

783. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

784. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

785. Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Jersey Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New Jersey Class members used their turnout gear with PFAS-infused products as intended.

786. These and other acts by Defendants were a direct and proximate cause of damages to New Jersey Class members.

**COUNT LVIII (against all Defendants)**
**Violation of the New Jersey Consumer Fraud Act**
**(N.J. STAT. ANN. § 56:8-1 *et seq.*)**

787. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

788. The New Jersey Consumer Fraud Act (New Jersey CFA) makes unlawful the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any

material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

789. Defendants, Plaintiff, and the New Jersey Class members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

790. Defendants engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

791. In purchasing their turnout gear, the New Jersey Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

792. The New Jersey Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

793. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

794. Defendants knew or should have known that their conduct violated the New Jersey CFA.

795. Defendants owed the New Jersey Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the New Jersey Class members; and

b. Intentionally concealed the foregoing from the New Jersey Class members.

796. Defendants' conduct proximately caused injuries to the New Jersey Class members.

797. The New Jersey Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

798. Defendants' violations present a continuing risk to the New Jersey Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

799. Plaintiff is entitled to recover treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

### 23. Claims brought on behalf of Class members who installed their turnout gear in New Mexico ("New Mexico Class members").

### COUNT LIX (against all Defendants)
### Strict Products Liability
### (design defect)

800. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

801. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

802. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New Mexico Class members, who might be foreseeably harmed by PFAS-infused products.

803. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, New Mexico Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

804. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to New Mexico Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

805. At all relevant times, New Mexico Class members used turnout gear infused with PFAS as intended.

806. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

807. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

808. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

809. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Mexico Class members have been injured.

810. These and other acts by Defendants were a direct and proximate cause of damages to New Mexico Class members.

**COUNT LX (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

811. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

812. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New Mexico Class members, as well as to all turnout gear manufacturers who treated their

turnout gear with PFAS-infused products before selling them to New Mexico Class members.

813. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and New Mexico Class members of those risks.

814. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

815. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

816. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

817. Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Mexico Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New Mexico Class members used their turnout gear with PFAS-infused products as intended.

818. These and other acts by Defendants were a direct and proximate cause of damages to New Mexico Class members.

**LXI (against all Defendants)**
**Violation of the New Mexico Unfair Trade Practices Act**
**(N.M. STAT. ANN. § 57-12-1 *et seq.*)**

819. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

820. The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D).

821. Defendants, Plaintiff, and the New Mexico Class members are "person[s]" within the meaning of N.M. STAT. ANN. § 57-12-2.

822. Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined by N.M. STAT. ANN. § 57-12-2.

823. In purchasing their turnout gear, the New Mexico Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

824. The New Mexico Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

825. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

826. Defendants knew or should have known that their conduct violated the New Mexico UTPA.

827. Defendants owed the New Mexico Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the New Mexico Class members; and

b. Intentionally concealed the foregoing from the New Mexico Class members.

828. Defendants' conduct proximately caused injuries to the New Mexico Class members.

829. The New Mexico Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

830. Defendants' violations present a continuing risk to the New Mexico Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

831. Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiff, the New Mexico Class members seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; reasonable attorneys' fees and costs; and all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

**24. Claims brought on behalf of Class members who installed their turnout gear in New York ("New York Class members").**

**COUNT LXII**
**New York Consumer Protection Claim**

832. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

833. Defendants' conduct violates New York Consumer Protection Statute General Business Law § 349

//

//

//

//

//

### 25. Claims brought on behalf of Class members who installed their turnout gear in North Carolina ("North Carolina Class members").

### COUNT LXIII (against all Defendants)
### Products Liability
### (design defect)

834. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

835. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

836. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to act negligently in placing into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the North Carolina Class members, who might be foreseeably harmed by PFAS-infused products.

837. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, North Carolina Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

838. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the North Carolina Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

839. At all relevant times, North Carolina Class members used turnout gear infused with PFAS as intended.

840. Defendants knew of these risks and nevertheless failed to use reasonable care and acted negligently in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

841. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

842. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

843. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, North Carolina Class members have been injured.

844. These and other acts by Defendants were a direct and proximate cause of damages to North Carolina Class members.

**COUNT LXIV (against all Defendants)**
**Products Liability**
**(failure to warn)**

845. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

846. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to act unreasonably in failing to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew or should have known about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including North Carolina Class members, as well as to all

turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to North Carolina Class members.

847. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, they unreasonably failed to warn turnout gear manufacturers, consumers, the public, and North Carolina Class members in particular of those risks.

848. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

849. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

850. Defendants' PFAS-infused products acted unreasonably by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

851. Defendants' failure to reasonably warn proximately caused reasonably foreseeable injuries to North Carolina Class members, who would have heeded legally adequate warnings about the dangers of PFAS products.

852. At all relevant times, North Carolina Class members used turnout gear infused with PFAS as intended.

853. Had Defendants reasonably provided adequate warnings regarding the dangers of PFAS to turnout gear manufacturers who treated turnout gear with PFAS-infused products, the turnout gear manufacturers would *not* have treated their turnout gear with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to North Carolina Class members about the dangers of turnout gear treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the North Carolina Class members would not have installed the turnout gear at issue.

854. These and other acts by Defendants were a direct and proximate cause of damages to North Carolina Class members.

**COUNT LXV (against all Defendants)**
**Violation of North Carolina Unfair and Deceptive Trade Practices Act**
**(N.C. GEN. STAT. § 75-1.1 *et seq.*)**

855. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

856. North Carolina's Unfair and Deceptive Acts and Practices Act (the North Carolina Act) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a).

857. Defendants engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

858. In purchasing their turnout gear, the North Carolina Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

859. The North Carolina Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

860. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

861. Defendants knew or should have known that their conduct violated the North Carolina Act.

862. Defendants owed the North Carolina Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the North Carolina Class members; and

b. Intentionally concealed the foregoing from the North Carolina Class members.

863. Defendants' conduct proximately caused injuries to the North Carolina Class members.

864. The North Carolina Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

865. Defendants' violations present a continuing risk to the North Carolina Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

866. Plaintiff seeks an order for treble their actual damages, costs, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

**26. Claims brought on behalf of Class members who installed their turnout gear in Oklahoma (collectively, "Oklahoma Class members").**

**COUNT LXVI (against all Defendants)**
**Strict Products Liability**
**(design defect)**

867. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

868. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

869. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the

Oklahoma Class members, who might be foreseeably harmed by PFAS-infused products.

870. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Oklahoma Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

871. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Oklahoma Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

872. At all relevant times, Oklahoma Class members used their turnout gear with PFAS-infused products as intended.

873. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

874. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

875. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

876. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Oklahoma Class members have been injured.

877. These and other acts by Defendants were a direct and proximate cause of damages to Oklahoma Class members.

**COUNT LXVII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

878. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

879. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Oklahoma Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Oklahoma Class members.

880. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Oklahoma Class members of those risks.

881. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

882. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

883. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

884. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Oklahoma Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Oklahoma Class members used their turnout gear with PFAS-infused products as intended.

885. These and other acts by Defendants were a direct and proximate cause of damages to Oklahoma Class members.

**COUNT LXVIII (against all Defendants)**
**Violation of the Oklahoma Consumer Protection Act**
**(OKLA. STAT. TIT. 15, § 751 *et seq.*)**

886. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

887. The Oklahoma Consumer Protection Act (Oklahoma CPA) provides that a "person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act when, in the course of the person's business, the person … [c]ommits an unfair or deceptive trade practice as defined in Section

752 of this title." OKLA. STAT. TIT. 15, § 753(21). Section 752(13) provides that a "deceptive trade practice" means "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."

888. Defendants, Plaintiff, and Oklahoma Class members are "persons" within the meaning of OKLA. STAT. TIT. 15, § 752.

889. Each Defendant is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15, § 15-751(1).

890. In purchasing their turnout gear, the Oklahoma Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

891. The Oklahoma Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

892. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

893. Defendants knew or should have known that their conduct violated the Oklahoma CPA.

894. Defendants owed the Oklahoma Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Oklahoma Class members; and

b. Intentionally concealed the foregoing from the Oklahoma Class members.

895. Defendants' conduct proximately caused injuries to the Oklahoma Class members.

896. The Oklahoma Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

897. Defendants' violations present a continuing risk to the Oklahoma Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

898. Because Defendants' unconscionable conduct caused injury to Plaintiff, Plaintiff seeks recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15, § 761.1. Plaintiff further seeks any other just and proper relief available under the Oklahoma CPA.

**27. Claims brought on behalf of Class members who installed their turnout gear in Oregon (collectively, "Oregon Class members").**

**COUNT LXIX (against all Defendants)**
**Strict Products Liability**
**(design defect)**

899. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

900. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

901. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Oregon Class members, who might be foreseeably harmed by PFAS-infused products.

902. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Oregon Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

903. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Oregon Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

904. At all relevant times, Oregon Class members used their turnout gear with PFAS-infused products as intended.

905. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

906. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products

outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

907. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

908. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Oregon Class members have been injured.

909. These and other acts by Defendants were a direct and proximate cause of damages to Oregon Class members.

**COUNT LXX (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

910. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

911. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Oregon Class

members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Oregon Class members.

912. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Oregon Class members of those risks.

913. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

914. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

915. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

916. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Oregon Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Oregon Class members used their turnout gear with PFAS-infused products as intended.

917. These and other acts by Defendants were a direct and proximate cause of damages to Oregon Class members.

**COUNT LXXI (against all Defendants)**
**Violation of the Oregon Unlawful Trade Practices Act**
**(OR. REV. STAT. § 646.605 *et seq.*)**

918. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

919. The Oregon Unfair Trade Practices Act (Oregon UTPA) provides that a "person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: … (u) Engages in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1)(u).

920. Each Defendant and each Oregon Class member is a "person" within the meaning of OR. REV. STAT. § 646.605(4).

921. Their PFAS-infused products are "goods" within the meaning of OR. REV. STAT. § 646.605(6).

922. In purchasing their turnout gear, the Oregon Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

923. The Oregon Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

924. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

925. Defendants knew or should have known that their conduct violated the Oregon UTPA.

926. Defendants owed the Oregon Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Oregon Class members; and

b. Intentionally concealed the foregoing from the Oregon Class members.

927. Defendants' conduct proximately caused injuries to the Oregon Class members.

928. The Oregon Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

929. Defendants' violations present a continuing risk to the Oregon Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

930. The Oregon Class members are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1), (8). Plaintiff is also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

931. The Oregon Class members seek attorneys' fees and any other just and proper relief available under OR. REV. STAT. § 646.638(1), (8).

**28. Claims brought on behalf of Class members who installed their turnout gear in Pennsylvania ("Pennsylvania Class members").**

**COUNT LXXII (against all Defendants)**
**Strict Products Liability**
**(design defect)**

932. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

933. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

934. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the

Pennsylvania Class members, who might be foreseeably harmed by PFAS-infused products.

935. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Pennsylvania Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

936. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Pennsylvania Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

937. At all relevant times, Pennsylvania Class members used their turnout gear with PFAS-infused products as intended.

938. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

939. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

940. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

941. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Pennsylvania Class members have been injured.

942. These and other acts by Defendants were a direct and proximate cause of damages to Pennsylvania Class members.

**COUNT LXXIII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

943. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

944. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Pennsylvania Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Pennsylvania Class members.

945. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Pennsylvania Class members of those risks.

946. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

947. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

948. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

949. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Pennsylvania Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Pennsylvania Class members used their turnout gear with PFAS-infused products as intended.

950. These and other acts by Defendants were a direct and proximate cause of damages to Pennsylvania Class members.

**COUNT LXXIV (against all Defendants)**
**Violation of the Pennsylvania Unfair Trade Practices**
**And Consumer Protection Law**
**(73 PA. CONS. STAT. § 201-1 *et seq.*)**

951. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

952. This claim is brought by Plaintiff on behalf of Pennsylvania purchasers who are members of the Class.

953. The Pennsylvania Unfair Trade Practices and Consumer Protection Law (Pennsylvania CPL) prohibits unfair or deceptive acts or practices, including

representing that goods or services have characteristics, benefits or qualities that they do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4).

954. Defendants, Plaintiff, and Pennsylvania Class members are "persons" within the meaning of 73 PA. CONS. STAT. § 201-2(2).

955. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

956. Defendants are liable to Plaintiff for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA. CONS. STAT. § 201-9.2(a).

**29. Claims brought on behalf of Class members who installed their turnout gear in South Carolina (collectively, "South Carolina Class members").**

**COUNT LXXV (against all Defendants)**
**Strict Products Liability**
**(design defect)**

957. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

958. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

959. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the South Carolina Class members, who might be foreseeably harmed by PFAS-infused products.

960. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, South Carolina Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

961. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the South Carolina Class members, to an

extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

962. At all relevant times, South Carolina Class members used their turnout gear with PFAS-infused products as intended.

963. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

964. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

965. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

966. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, South Carolina Class members have been injured.

967. These and other acts by Defendants were a direct and proximate cause of damages to South Carolina Class members.

**COUNT LXXVI (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

968. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

969. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including South Carolina Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to South Carolina Class members.

970. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and South Carolina Class members of those risks.

971. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

972. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

973. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

974. Defendants' failure to warn proximately caused reasonably foreseeable injuries to South Carolina Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, South Carolina Class members used their turnout gear with PFAS-infused products as intended.

975. These and other acts by Defendants were a direct and proximate cause of damages to South Carolina Class members.

## COUNT LXXVII (against all Defendants)
## Violation of the South Carolina Unfair Trade Practices Act
## (S.C. CODE ANN. § 39-5-10 *et seq.*)

976. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

977. This claim is brought by Plaintiff on behalf of South Carolina purchasers who are members of the Class.

978. The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20(a).

979. Each Defendant is a "person" under S.C. CODE ANN. § 39-5-10.

*980.* Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiff seeks monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiff's damages should be trebled.

981. Plaintiff further alleges that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**30. Claims brought on behalf of Class members who installed their turnout gear in South Dakota ("South Dakota Class members").**

**COUNT LXXVIII (against all Defendants)**
**Strict Products Liability**
**(design defect)**

982. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

983. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

984. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the South Dakota Class members, who might be foreseeably harmed by PFAS-infused products.

985. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, South Dakota Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

986. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the South Dakota Class members, to an extent

beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

987. At all relevant times, South Dakota Class members used their turnout gear with PFAS-infused products as intended.

988. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

989. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

990. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

991. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, South Dakota Class members have been injured.

992. These and other acts by Defendants were a direct and proximate cause of damages to South Dakota Class members.

**COUNT LXXIX (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

993. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

994. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including South Dakota Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to South Dakota Class members.

995. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and South Dakota Class members of those risks.

996. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

997. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

998. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

999. Defendants' failure to warn proximately caused reasonably foreseeable injuries to South Dakota Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, South Dakota Class members used their turnout gear with PFAS-infused products as intended.

1000. These and other acts by Defendants were a direct and proximate cause of damages to South Dakota Class members.

//

//

//

//

**COUNT LXXX (against all Defendants)**
**Violation of the South Dakota Deceptive Trade Practices**
**And Consumer Protection Law**
**(S.D. CODIFIED LAWS § 37-24-6 *et seq.*)**

1001. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1002. The South Dakota Deceptive Trade Practices and Consumer Protection Law (South Dakota CPL) provides that it is a "deceptive act or practice for any person to … (1) Knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby…." S.D. CODIFIED LAWS §§ 37-24-6.

1003. In purchasing their turnout gear, the South Dakota Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1004. The South Dakota Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1005. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1006. Defendants knew or should have known that their conduct violated the South Dakota CPL.

1007. Defendants owed the South Dakota Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the South Dakota Class members; and

b. Intentionally concealed the foregoing from the South Dakota Class members.

1008. Defendants' conduct proximately caused injuries to the South Dakota Class members.

1009. The South Dakota Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1010. Defendants' violations present a continuing risk to the South Dakota Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1011. Under S.D. Codified Laws § 37-24-31, the South Dakota Class members are entitled to a recovery of their actual damages suffered as a result of Defendants' acts and practices.

**31. Claims brought on behalf of Class members who installed their turnout gear in Tennessee ("Tennessee Class members").**

**COUNT LXXXI (against all Defendants)**
**Strict Products Liability**
**(design defect)**

1012. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

1013. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1014. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Tennessee Class members, who might be foreseeably harmed by PFAS-infused products.

1015. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Tennessee Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1016. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Tennessee Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1017. At all relevant times, Tennessee Class members used their turnout gear with PFAS-infused products as intended.

1018. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1019. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1020. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1021. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Tennessee Class members have been injured.

1022. These and other acts by Defendants were a direct and proximate cause of damages to Tennessee Class members.

**COUNT LXXXII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

1023. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1024. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably

harmed by the ordinary use and misuse of their products, including Tennessee Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Tennessee Class members.

1025. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Tennessee Class members of those risks.

1026. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1027. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1028. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1029. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Tennessee Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times,

Tennessee Class members used their turnout gear with PFAS-infused products as intended.

1030. These and other acts by Defendants were a direct and proximate cause of damages to Tennessee Class members.

**32. Claims brought on behalf of Class members who installed their turnout gear in Texas ("Texas Class members").**

**COUNT LXXXIII (against all Defendants)**
**Strict Products Liability**
**(design defect)**

1031. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1032. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1033. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Texas Class members, who might be foreseeably harmed by PFAS-infused products.

1034. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Texas Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1035. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Texas Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1036. At all relevant times, Texas Class members used their turnout gear with PFAS-infused products as intended.

1037. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by

PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1038. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1039. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1040. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Texas Class members have been injured.

1041. These and other acts by Defendants were a direct and proximate cause of damages to Texas Class members.

**COUNT LXXXIV (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

1042. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

1043. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Texas Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Texas Class members.

1044. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Texas Class members of those risks.

1045. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1046. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1047. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1048. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Texas Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Texas Class members used their turnout gear with PFAS-infused products as intended.

1049. These and other acts by Defendants were a direct and proximate cause of damages to Texas Class members.

**COUNT LXXXV (against all Defendants)**
**Violation of the Texas Deceptive Trade**
**Practices and Consumer Protection Act**
**(TEX. BUS. & COM. CODE § 17.4 *et seq.*)**

1050. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint.

1051. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful…." TEX. BUS. & COM. CODE § 17.46(a). The Texas DTPA further declares that "the term 'false, misleading, or deceptive acts or practices' includes, but is not limited to, the following acts: several specific actions to be unlawful, including: … (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce

the consumer into a transaction into which the consumer would not have entered had the information been disclosed…."

1052. Their PFAS-infused products are "goods" within the meaning of TEX. BUS. & COM. CODE § 17.45(1).

1053. Defendants, Plaintiff, and the Texas Class members are "persons" within the meaning of TEX. BUS. & COM. CODE § 17.45(3).

1054. Each Plaintiff and each Texas Class member is a "consumer" within the meaning of TEX. BUS. & COM. CODE § 17.41(4).

1055. Defendants committed the acts complained of herein in the course of "trade" and "commerce" within the meaning of TEX. BUS. & COM. CODE § 17.41(6)

1056. In purchasing their turnout gear, the Texas Class members were deceived by Defendants' knowing failure to disclose that their turnout gear was treated with PFAS-infused products.

1057. The Texas Class members reasonably relied on Defendants' knowing omissions, and they did not and could not unravel Defendants' deception on their own.

1058. Defendants' knowing concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1059. Defendants knew that their conduct violated the Texas DTPA.

1060. Defendants owed the Texas Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Texas Class members; and

b. Intentionally concealed the foregoing from the Texas Class members.

1061. Defendants' conduct proximately caused injuries to the Texas Class members.

1062. The Texas Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1063. Defendants' violations present a continuing risk to the Texas Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1064. As a direct and proximate result of Defendants' violations of the Texas DTPA, the Texas Class members have suffered injury-in-fact and/or actual damages.

1065. Plaintiff seeks monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

1066. Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), the Texas Class members are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

1067. On April 1, 2025, Plaintiff sent a letter to Defendants complying with TEX. BUS. & COM. CODE ANN. § 17.505.

**33. Claims brought on behalf of Class members who installed their turnout gear in Utah ("Utah Class members").**

**COUNT LXXXVI (against all Defendants)**
**Strict Products Liability**
**(design defect)**

1068. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1069. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1070. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is

unreasonably dangerous, and they owed that duty to all persons, including the Utah Class members, who might be foreseeably harmed by PFAS-infused products.

1071. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Utah Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1072. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Utah Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1073. At all relevant times, Utah Class members used their turnout gear with PFAS-infused products as intended.

1074. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1075. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1076. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1077. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Utah Class members have been injured.

1078. These and other acts by Defendants were a direct and proximate cause of damages to Utah Class members.

**COUNT LXXXVII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

1079. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1080. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Utah Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Utah Class members.

1081. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Utah Class members of those risks.

1082. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1083. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1084. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1085. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Utah Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Utah Class members used their turnout gear with PFAS-infused products as intended.

1086. These and other acts by Defendants were a direct and proximate cause of damages to Utah Class members.

**34. Claims brought on behalf of Class members who installed their turnout gear in Washington ("Washington Class members").**

**COUNT LXXXVIII (against all Defendants)**
**Violation of Washington Consumer Protection Act**
**(WASH. REV. CODE ANN. § 19.86.010 *et seq.*)**

1087. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1088. The Washington Consumer Protection Act (Washington CPA) broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE. ANN. § 19.96.010.

1089. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE. ANN. § 19.96.010.

1090. In purchasing their turnout gear, the Washington Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1091. The Washington Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1092. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1093. Defendants knew or should have known that their conduct violated the Washington CPA.

1094. Defendants owed the Washington Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Washington Class members; and

b. Intentionally concealed the foregoing from the Washington Class members.

1095. Defendants' conduct proximately caused injuries to the Washington Class members.

1096. The Washington Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1097. Defendants' violations present a continuing risk to the Washington Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1098. Defendants are liable to Plaintiff for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE. ANN. § 19.86.090.

**35. Claims brought on behalf of Class members who installed their turnout gear in West Virginia ("West Virginia Class members").**

**COUNT LXXXIX (against all Defendants)**
**Strict Products Liability**
**(design defect)**

1099. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1100. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1101. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is

not reasonably safe, and they owed that duty to all persons, including the West Virginia Class members, who might be foreseeably harmed by PFAS-infused products.

1102. PFAS-infused products are not reasonably safe for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, West Virginia Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1103. At all relevant times, PFAS-infused turnout gear was in a defective condition not reasonably safe for the West Virginia Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1104. At all relevant times, West Virginia Class members used their turnout gear with PFAS-infused products as intended.

1105. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and not reasonably safe for persons and to property.

1106. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1107. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1108. As a direct and proximate result of Defendants' not reasonably safe design of PFAS-infused products, West Virginia Class members have been injured.

1109. These and other acts by Defendants were a direct and proximate cause of damages to West Virginia Class members.

**COUNT XC (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

1110. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1111. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including West Virginia Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to West Virginia Class members.

1112. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and West Virginia Class members of those risks.

1113. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1114. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1115. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1116. Defendants' failure to warn proximately caused reasonably foreseeable injuries to West Virginia Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, West Virginia Class members used their turnout gear with PFAS-infused products as intended.

1117. These and other acts by Defendants were a direct and proximate cause of damages to West Virginia Class members.

**COUNT XCI (against all Defendants)**
**Violation of the West Virginia Consumer Credit and Protection Act**
**(W. VA. CODE § 46A-1-101 *et seq.*)**

1118. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1119. The West Virginia Consumer Credit and Protection Act (West Virginia CCPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. VA. CODE § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include: "The act, use or employment by any person of

any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby…." W. Va. Code § 46A-6-102(7)(M).

1120. Each Defendant and each West Virginia Class member is a "person" under W. Va. Code § 46A-1-102(31).

1121. The West Virginia Class members are "consumers" as defined by W. Va. Code §§ 46A-1-102(12) and 46A-6-102(2), who purchased turnout gear treated with PFAS-infused products.

1122. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

1123. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the West Virginia Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

1124. In purchasing their turnout gear, the West Virginia Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1125. The West Virginia Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1126. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1127. Defendants knew or should have known that their conduct violated the West Virginia CCPA.

1128. Defendants owed the West Virginia Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the West Virginia Class members; and

b. Intentionally concealed the foregoing from the West Virginia Class members.

1129. Defendants' conduct proximately caused injuries to the West Virginia Class members.

1130. The West Virginia Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1131. Defendants' violations present a continuing risk to the West Virginia Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1132. Pursuant to W. VA. CODE § 46A-6-106, Plaintiff seeks monetary relief against the Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

1133. Plaintiff also seeks punitive damages against the Defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiff to cruel and unjust hardship as a result.

1134. Plaintiff further seeks restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101 *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

1135. On April 1, 2025, Plaintiff sent a letter to Defendants complying with W. VA. CODE § 46A-6-106(b).

//

//

//

//

//

**36. Claims brought on behalf of Class members who installed their turnout gear in Wisconsin ("Wisconsin Class members").**

**COUNT XCII (against all Defendants)**
**Strict Products Liability**
**(design defect)**

1136. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1137. At all times relevant to this Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1138. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous and not reasonably safe, and they owed that duty to all persons, including the Wisconsin Class members, who might be foreseeably harmed by PFAS-infused products.

1139. PFAS-infused products are unreasonably dangerous and not reasonably safe for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c. Defendants failed to disclose these threats to fire departments, Wisconsin Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1140. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to (and not reasonably safe for) the Wisconsin Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1141. At all relevant times, Wisconsin Class members used their turnout gear with PFAS-infused products as intended.

1142. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS, the omission of which renders those products not reasonably safe. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1143. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1144. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1145. As a direct and proximate result of Defendants' unreasonably dangerous and not reasonably safe design of PFAS-infused products, Wisconsin Class members have been injured.

1146. These and other acts by Defendants were a direct and proximate cause of damages to Wisconsin Class members.

**COUNT XCIII (against all Defendants)**
**Strict Products Liability**
**(failure to warn)**

1147. Plaintiff incorporates by reference the allegations in the preceding paragraphs of this complaint.

1148. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably

harmed by the ordinary use and misuse of their products, including Wisconsin Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Wisconsin Class members.

1149. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Wisconsin Class members of those risks.

1150. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1151. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1152. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1153. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Wisconsin Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times,

Wisconsin Class members used their turnout gear with PFAS-infused products as intended.

1154. These and other acts by Defendants were a direct and proximate cause of damages to Wisconsin Class members.

1155. On April 1, 2025, Plaintiff mailed the statutory notice required by Wyoming Statutes § 40-12-109.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff, on behalf of itself, its members, and members of the Class, seek monetary and equitable relief, including:

A. Compensatory damages and treble damages as allowed by law;

B. A corrective notice program under Fed. R. Civ. P. (b)(23); and

C. Such other and further relief as the Court deems appropriate.

//

//

//

//

//

//

//

//

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury as to all issues so triable as a matter of right.

DATED: April 3rd, 2025

Respectfully submitted,

*/s/ John Heenan*
John Heenan
HEENAN & COOK
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
Facsimile: (406) 839-9092
Email: john@lawmontana.com

*/s/: Michael A. Bliven*
Michael A. Bliven
BLIVEN LAW FIRM
704 South Main Street
Kalispell, MT 59901
Telephone: (406) 625-0100
Email: mike@blivenlawfirm.com

*/s/ Steve W. Berman*
Steve W. Berman (*pro hac vice* to be applied for)
*/s/ Craig R. Spiegel*
Craig R. Spiegel (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
craigs@hbsslaw.com
*Attorneys for Plaintiff*